Joseph G. **SALINGER,** Alice R. **Salinger,** Martin T. **Kelinson,** Virgil P. **Kincaid,** and Helen M. **Kincaid, Plaintiffs,**

v.

**PROJECTAVISION, INC.,** Marvin **Maslow,** Eugene **Dolgoff,** Martin J. **Holleran,** and Howard **Ladd, Defendants.**

No. 95 Civ. 4862(JGK).

United States District Court,
S.D. New York.

July 31, 1997.

Robert J. Berg, Law Offices of Robert J. Berg, Mamaroneck, NY, Allyn Z. Lite, Newark, NJ, Carol V. Gilden, Much, Shelist, Freed, Denenberg, Amert, Bell & Rubenstein, Chicago, IL, William J. French, Glen E. Lavy, Conant, Whittenburg, French & Schachter, Milwaukee, WI, for plaintiffs.

Mark L. Weyman, Ann S. Ginsberg, Catherine M. Stockwell, Anderson, Kill, Olick & Oshinsky, P.C., New York City, for defendants Projectavision, Maslow, Holleran, and Ladd.

John J. Gallagher, James Sandnes, Karin Endy Ryan, Corbin, Silverman & Sanseverino, New York City, for defendant Dolgoff.

### OPINION AND ORDER

KOELTL, District Judge:

This is an action for securities fraud based on allegedly false representations and omissions by the defendants in Projectavision, Inc.'s filings with the Securities and Exchange Commission ("SEC"), its press releases, and other public statements. Projectavision is a Delaware corporation with its principal place of business in New York City. Projectavision's securities are publicly traded on the over-the-counter market and quoted on the National Association of Securities Dealers Automated Quotation ("NASDAQ") system. Defendants Maslow, Dolgoff, Holleran, and Ladd (collectively, the "Individual Defendants") are current or former officers and directors of Projectavision.

On July 25, 1996, the Court dismissed the plaintiffs' First Amended Complaint without prejudice to the filing of a Second Amended Complaint. *See Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402 (S.D.N.Y.1996) (*"Salinger I"*). The Court dismissed the plaintiffs' claim against all defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder, as time-barred and for failure to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b). The plaintiffs' claim against the Individual Defendants for control person liability pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), necessarily fell with dismissal of the underlying Section 10(b) and Rule 10b–5 claim. The Court also declined supplemental jurisdiction over the plaintiffs'

claims for common law fraud and negligent misrepresentation pursuant to 28 U.S.C. § 1367(c)(3). Familiarity with that decision is assumed.

On August 23, 1996, the plaintiffs filed a Second Amended Complaint, now nearly 100 pages, in which they again assert a claim against all defendants under § 10(b) and Rule 10b–5 based on the same filings and press releases that were challenged in the First Amended Complaint. The plaintiffs also renew their claim for control person liability under Section 20(a) of the Exchange Act against the Individual Defendants. Finally, the plaintiffs replead their claims for common law fraud and negligent misrepresentation under New York law against all of the defendants. The plaintiffs also seek to certify this suit as a class action on behalf of those purchasers of securities of Projectavision who purchased those securities between November 2, 1992, and April 7, 1995 (the "Class Period").

The defendants now move to dismiss the Second Amended Complaint.[1] The defendants argue that the plaintiffs' § 10(b) and Rule 10b–5 claim is time-barred and that the plaintiffs have failed to plead scienter properly pursuant to Federal R. Civ. P. 9(b). They also contend that the control person liability claim must be dismissed because there is no valid underlying securities fraud claim alleged. The defendants urge the Court to decline supplemental jurisdiction over the two state law claims if the claims under the Exchange Act are dismissed. For the reasons explained below, the defendants' motion is granted.

## I.

■ On a motion to dismiss, the factual allegations of the complaint are to be accepted as true and all reasonable inferences are construed in the plaintiff's favor. *See Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

Moreover, a court may consider SEC filings, even where they are not referenced in the complaint, *see Kramer v. Time Warner Inc.,* 937 F.2d 767, 773–74 (2d Cir.1991); *Salinger I,* 934 F.Supp. at 1405, and the full text of press releases, magazine articles, analyst's reports, and wire service stories that are referred to or quoted from in the complaint, *see San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 808–09 (2d Cir.1996); *Salinger I,* 934 F.Supp. at 1405. A court should dismiss a complaint under Fed.R.Civ.P. 12(b)(6) only "if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

The allegations in the Second Amended Complaint substantially duplicate those in the First Amended Complaint. The facts as alleged in the Second Amended Complaint and the relevant provisions of Projectavision's SEC filings are as follows. Projectavision is a company that has attempted to develop a solid state tubeless projection television system that employs a patented de-pixelization technology and a liquid crystal display. (Second Am. Compl. ¶ 2.) The de-pixelization technology was developed originally by Dolgoff, (Second Am. Compl. ¶ 33), and in partnership with Maslow, (Second Am. Compl. ¶ 34), Projectavision was formed in 1988. (Second Am. Compl. ¶ 35.) On July 31, 1990, Dolgoff and Maslow took Projectavision public. (Second Am. Compl. ¶ 37.) Projectavision continued as a development company over the next several years, financing its research and development through further sales of its securities. (Second Am. Compl. ¶ 38.) During 1991 and 1992 the company reported no revenue, (Second Am. Compl. ¶ 38), and during 1993 and 1994 it conducted eleven private securities placements raising over $12 million. (Second Am. Compl. ¶ 41.) During this time, the company sustained mounting loss-

---

1. The defendants are divided into two groups represented by different counsel. Defendants Projectavision, Maslow, Holleran, and Ladd comprise one group, and defendant Dolgoff is the other. Each group has moved to dismiss separately, although the motions overlap to some extent.

es: approximately $1.6 million in 1991, $2 million in 1992, $2.7 million in 1993, and $5.6 million in 1994. (Second Am. Compl. ¶ 40.)

According to the plaintiffs, the defendants misled the investing public through public announcements and SEC filings in order to prop up the stock price and sustain Projectavision's repeated trips to the capital markets for financing. The alleged misrepresentations and omissions relate principally to the characterizations of certain licensing agreements Projectavision executed beginning in late 1992 and the state of development of Projectavision's products.

On or about November 2, 1992, Projectavision announced that a major Japanese electronics manufacturer intended to license Projectavision's proprietary depixelization technology. (Second Am. Compl. ¶ 44.) Maslow, now Projectavision's Chief Executive Officer, declared: "We are very excited by these developments. We believe that it affirms the commercial viability of our technology. Most significantly, this event marks our transition from research and product development to the beginning of international distribution and sale of products enhanced by the company's technology." (Second Am. Compl. ¶ 44.) On or about March 1, 1993, Projectavision announced it had agreed to many of the terms of its prospective license agreement, including the amount of royalty payments. (Second Am. Compl. ¶ 46.) Maslow publicly announced the progress towards an agreement, stating in a press release: "This event marks the culmination of our research and product development activity. We are excited about beginning the international sale and distribution of television products utilizing Projectavision's proprietary technology." (Second Am. Compl. ¶ 46.) On March 31, 1993, Projectavision disclosed that it had signed a patent license with Matsushita Electric Industrial Co., Ltd. ("Matsushita"). (Second Am. Compl. ¶ 48.) Company officials reportedly commented that although the terms of the Matsushita license were confidential, Projectavision expected that "products using [the Projectavision feature] are imminent and Projectavision would be mentioned in Matsushita product literature." (Second Am. Compl. ¶ 51.)

The market price of Projectavision common stock nearly doubled from $8¾ per share at the close of trading just prior to the March 1 press release to $16¼ per share on the day the agreement with Matsushita was announced. (Second Am. Compl. ¶ 50.) The market prices of Projectavision's preferred stock and warrants posted similar gains. (Second Am. Compl. ¶ 50.)

In its Form 10–K filing for the period ended December 31, 1992, filed April 15, 1993, Projectavision disclosed the following information about the Matsushita license:

> On March 29, 1993, [Projectavision] entered into a patent license agreement with [Matsushita] which granted Matsushita the right to use [Projectavision]'s patented depixelization video projection technology in connection with the manufacturing and marketing of an advanced tubeless consumer television system in the United States.... Upon signing the [license], [Projectavision] received funds from Matsushita in connection with [Projectavision]'s agreement with Matsushita relating to certain matters concerning [Projectavision]'s proprietary technology. The sum received from Matsushita, as well as other terms and conditions of the Matsushita License, are expressly subject to strict confidentiality provisions set forth in the Matsushita License.

(Weyman Aff. Ex. F [Form 10–K 1992] at 8.)

The plaintiffs allege that the Matsushita license was not a genuine marketing breakthrough and did not represent the beginning of the company's transformation from a development company to a producer of projection television systems. In reality, the plaintiffs contend, the agreement was merely a settlement of Matsushita's alleged infringement of Projectavision's patent. Pursuant to the license Matsushita agreed to remove the infringing technology from its product line and to pay Projectavision a one-time "royalty" of $105,000. Although the agreement did include terms governing any future use of Projectavision technology by Matsushita, Matsushita allegedly did not intend to act as a licensee. Subsequent SEC filings reported the receipt of the $105,000 payment in 1993, although the plaintiffs complain that Projec-

tavision misrepresented in its quarterly SEC filings that it *"began* receiving revenue for licensing of its technology," knowing the $105,000 was an isolated payment. (Second Am. Compl. ¶¶ 58, 98.)

The plaintiffs contend that there was "no reasonable basis for [Projectavision] to lead investors and the investment community to believe that this agreement would create exciting revenue potential for Projectavision and to continue to tout the existence of the Matsushita licensing agreement to investors." (Second Am. Compl. ¶ 56.) The plaintiffs assert that research analysts based their positive assessment of the prospects for Projectavision's stock on the potential for royalty income from the Matsushita license, all the while under the misimpression that the license represented the company's first genuine marketing relationship rather than the compromise of a patent infringement claim. (Second Am. Compl. ¶¶ 61, 104.)

Through the end of 1994 Projectavision entered into several other license agreements with companies such as CMC Magnetics Corp. of Taiwan, (Second Am. Compl. ¶ 64), Samsung Electronics Co., (Second Am. Compl. ¶ 107), and Alternate Realities Corp. (Second Am. Compl. ¶ 109.) The company also continued its research and development efforts, culminating with the demonstration of a prototype projection television at the Consumer Electronics Show in January 1994. (Second Am. Compl. ¶¶ 79, 82, 84, 86, 91.) In mid–1994 Projectavision announced it would unveil two new prototype television projectors at the summer Consumer Electronics Show in Chicago. (Second Am. Compl. ¶ 101.) Another "debut" of Projectavision's depixelization technology in the form of a prototype fifty-inch rear projection television took place at the next Consumer Electronics Show in early 1995. (Second Am. Compl. ¶ 111.)

The plaintiffs allege that the defendants' statements conveyed the false impression that Projectavision's depixelization technology was "imminently ready for commercial exploitation by major television and electronics manufacturers, and that, as a result, Projectavision would soon be receiving a steady stream of extremely lucrative licensing revenues." (Second Am. Compl. ¶ 113.)

The plaintiffs also allege that Dolgoff, Projectavision's founder, one-time President and chief scientist, corroborates their contention that the company was misrepresenting the state of its product development. On April 7, 1995, Dolgoff filed a lawsuit in New York Supreme Court alleging that he had warned the other directors that "dissemination to the financial community of technical and commercialization assessments was far too optimistic." (Second Am. Compl. ¶ 120.) Dolgoff attached internal Projectavision documents to his complaint in support of his claim that the there were "severe difficulties ... in developing and marketing [the] technology...." (Second Am. Compl. ¶ 126.) In fact, those same memoranda reveal that Dolgoff himself was blamed for the company's inability to make product advances. (Second Am. Compl. ¶¶ 116–19.)

The plaintiffs also allege that even Projectavision's other license agreements with CMC Magnetics, Samsung, and Alternate Realities were one-sided in the sense that there were no mandatory payments or requirements that the licensee use Projectavision's technology. (Second Am. Compl. ¶ 121.) The plaintiffs maintain that the defendants failed to disclose this aspect of the licenses, leaving the mistaken impression that these transactions would soon generate a steady royalty stream. (Second Am. Compl. ¶ 121.)

The plaintiffs allege that the market price of Projectavision securities dropped precipitously from the first half of 1993 to the present and that the collapse of Projectavision stock was attributable to the defendants' alleged fraud. (Second Am. Compl. ¶¶ 8, 122, 125.)

The foregoing allegations form the basis for the plaintiffs' claims under § 10(b) of the Exchange Act and Rule 10b–5. The plaintiffs' claims against the Individual Defendants under § 20(a) are based on the underlying § 10(b) and Rule 10b–5 violation and the additional allegations of control exerted by each. (Second Am. Compl. ¶¶ 17–24, 136–38.) The plaintiffs allege that the Individual Defendants made their fraudulent represen-

tations and omissions in order to promote interest in Projectavision's technology, to protect their corporate positions and executive compensation, to inflate Projectavision's stock price and facilitate further private stock sales and future public securities offerings, to enhance the value of the Individual Defendants' own portfolios of stock and stock options, and to enable certain family member shareholders of Projectavision to reap enormous illegal insider trading profits by selling large portions of common shares at greatly inflated prices. (Second Am. Compl. ¶¶ 25, 40, 42, 43.)

## II.

■ The defendants first argue that the plaintiff's claim under § 10(b) and Rule 10b–5 should be dismissed as time-barred. "Litigation instituted pursuant to § 10(b) and Rule 10b–5 ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991); *see also Dodds v. Cigna Secs., Inc.,* 12 F.3d 346, 349 (2d Cir.1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). The one-year prong of the statute of limitations on § 10(b) and Rule 10b–5 claims begins to run when the plaintiffs have either actual or constructive notice of the alleged fraud. *See Dodds,* 12 F.3d at 350; *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983); *Salinger I,* 934 F.Supp. at 1408. "[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. Such circumstances are often analogized to 'storm warnings.'" *Dodds,* 12 F.3d at 350 (citations omitted).

■ The question of constructive knowledge and inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a motion to dismiss. *See Vassilatos v. Ceram Tech Int'l, Ltd.,* No. 92 Civ. 4574, 1993 WL 177780, at *4 (S.D.N.Y. May 19, 1993) (dismissal not appropriate where discovery might yield facts to support or refute plaintiffs' constructive knowledge); *Siebert v. Nives,* 871 F.Supp. 110, 116 (D.Conn.1994) (noting that not every case is susceptible to determination of inquiry notice as a matter of law). Nonetheless, the test is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves. *See Dodds,* 12 F.3d at 352 n. 3 ("Where ... the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers such as the prospectuses and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate."); *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 850 F.Supp. 1105, 1132–33 (S.D.N.Y.1993) ("*Integrated I*"); *Lenz v. Associated Inns & Restaurants Co. of America,* 833 F.Supp. 362, 370 & n. 7 (S.D.N.Y.1993); *see also Menowitz v. Brown,* 991 F.2d 36, 42 (2d Cir.1993) (affirming dismissal based on finding that plaintiffs were placed on inquiry notice based on SEC filings). The plaintiffs need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them. *See Dodds,* 12 F.3d at 351 ("An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice."); *In re Integrated Resources Real Estate Sec. Litig.,* 815 F.Supp. 620, 637 (S.D.N.Y.1993) ("*Integrated II*") ("[T]he statute is not tolled for a plaintiff's leisurely discovery of the full details of the alleged scheme. Instead, the period runs from the time at which a plaintiff should have discovered the general fraudulent scheme." (citations and internal quotations omitted)). The available facts must establish the probability of fraud, however, and not merely the possibility of fraud. *See Lenz,* 833 F.Supp. at 373 & n. 10; *Integrated II,* 815 F.Supp. at 638.

### A.

■ In *Salinger I,* the Court found that the statute of limitations period began to run

by March 1994 and would have expired months before the plaintiffs filed this action in June 1995. *See Salinger I*, 934 F.Supp. at 1410. The plaintiffs now contend that they did not have actual or constructive notice of the alleged fraud until defendant Dolgoff filed his complaint in state court in April 1995. For the most part, however, the plaintiffs merely attempt to reargue issues decided by this Court in *Salinger I*. As in *Salinger I*, the plaintiffs' claims of fraud can be divided into two basic assertions: "(1) Projectavision's products were out of development and ready for production, i.e. that the company was moving out of its development stage; and (2) the licenses, including the Matsushita license, were about to generate a steady stream of royalty income." *Salinger I*, 934 F.Supp. at 1409. The plaintiffs rely on the same SEC filings and publications that were the basis of the First Amended Complaint.

With respect to the defendants' alleged misrepresentation that Projectavision's products were out of development and ready for production, the plaintiffs assert that the Second Amended Complaint "now alleges at least twenty-one public statements from November of 1992 through January of 1995 relating to the impending profitability, manufacture, and sale of Projectavision's technology, eight of which specifically predict the timing of introduction of Projectavision products into the commercial market." (Pls.' Mem. Law Opp'n Mot. Dismiss Defs. Projectavision, Maslow, Holleran & Ladd at 8–9.) However, each of these public statements or SEC filings referenced therein appeared in the First Amended Complaint and were carefully considered by the Court in *Salinger I*. As this Court found in *Salinger I*:

> The consistent and repeated disclosures in Projectavision's SEC filings would have suggested to an investor of ordinary intelligence that a representation that Projectavision was "imminently ready for commercial exploitation by major television and electronics manufacturers," . . . was suspect and deserved further inquiry. These disclosures were made repeatedly in public filings including in March 1994 when Projectavision's 1993 Form 10–K was filed. Because the information made available in

> the SEC filings was sufficient to place an investor of ordinary intelligence on notice that the company was still in its development stage, the one-year statute of limitations would have expired by April 1995, prior to the filing of this suit. . . . The plaintiffs offer nothing more than conclusory argument that the information contained in Projectavision's SEC filings described above was insufficient to constitute inquiry notice. Where the company's public disclosure reveals that a particular representation about a crucial feature of an investment has not materialized, the statute of limitations is triggered.

*Salinger I*, 934 F.Supp. at 1410.

The plaintiffs contend that the cautionary language contained in the SEC filings were simply generic warnings that did not place the plaintiffs on inquiry notice of the fraud. However, the defendants made it clear in more than conclusory boiler plate language that Projectavision was a development company, that the Projector had not yet been manufactured, and that there was no assurance that the Projector or any other product would be developed successfully. (Weyman Aff. Ex. F [April 1993 Form 10–K for 1992] at 21; Weyman Aff. Ex. G [Oct.1993 Form S–3] at 5–6, 10; Weyman Aff. Ex. H [Dec. 1993 Amendment No. 1 to Form S–3] at 5–7, 10; Weyman Aff. Ex. I [Dec.1993 Prospectus] at 5–6, 10; Weyman Aff. Ex. J [March 1994 Form 10–K for 1993] at 7, 23, F–2, F–10.) The plaintiffs "offer no serious rationale as to why a reasonable investor who was reading the prospectuses would consider the warnings too generic to be taken seriously and, at the same time, would find the sections discussing the opportunities and protections enticingly specific." *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 8 (2d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2433, 138 L.Ed.2d 194 (1997).

The plaintiffs also argue that they could not have been placed on inquiry notice by the defendants' failure to meet the predicted production schedule because the delays in the manufacture of the Projector were the normal delays experienced by any development stage company. This argument does not

help the plaintiffs. Indeed, it undermines their claims. If the plaintiffs did not believe that the manufacture of Projectavision's products was imminent because a development stage company would encounter delays in actually bringing a product into commercial production, then they were not defrauded by statements that they now allege promised imminent production.

With respect to the defendants' alleged misrepresentation that the licenses were about to generate a steady stream of royalty income, the plaintiffs' allegation that they believed that Projectavision possessed a commercially viable product whose market introduction was imminent is contradicted by the financial results and cautionary language that appeared in Projectavision's SEC filings. (Weyman Aff. Ex. F [April 1993 Form 10–K for 1992] at 8, 21; Weyman Aff. Ex. G [October 1992 Form S–3] at 5–6; Weyman Aff. Ex. H [Dec.1993 Amendment No. 1 to Form S–3] at 5–6; Weyman Aff. Ex. I [Dec.1993 Prospectus] at 5–6; Weyman Aff. Ex. J [March 1994 Form 10–K for 1993] at 23–25, F–11.) "[T]he information available in Projectavision's SEC filings, combined with information reported in the very press reports on which the plaintiffs rely and the failure of royalty income to develop would place an investor of ordinary intelligence on notice that the investor should inquire about the truthfulness of any representations that the licenses would be extremely lucrative." *Salinger I,* 934 F.Supp. at 1412. Thus, the statute of limitations began to run by March 1994 when the plaintiffs were placed on inquiry notice of the alleged fraud.

### B.

■ The plaintiffs also contend that the defendants' fraudulent concealment of material facts rendered any investigation futile. Although it is not clear that the doctrine of fraudulent concealment can toll the statute of limitations for a securities fraud claim, *compare Lampf,* 501 U.S. at 363, 111 S.Ct. at 2782 (finding that "the equitable tolling doctrine is fundamentally inconsistent with the 1–and–3–year structure" for the statute of limitations for § 10(b) and Rule 10b–5 claims) *with Dodds,* 12 F.3d at 352 ("If the defendants actively prevented [the plaintiff] from discovering the basis of her claim, then the statute would be tolled for the period of concealment."), the plaintiffs in any event have failed to plead fraudulent concealment with the particularity required by Fed. R.Civ.P. 9(b).[2]

■ Under the doctrine of fraudulent concealment, the statute of limitations will be tolled if the plaintiff pleads, with particularity, either active concealment or passive concealment. In order to establish active concealment, the plaintiff must prove that the defendant took subsequent affirmative steps in addition to the original fraud to prevent the plaintiff from discovering the fraud. *See Butala v. Agashiwala,* No. 95 CIV. 936, 1997 WL 79845, at *6 (S.D.N.Y. Feb. 24, 1997); *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,* 778 F.Supp. 695, 700–01 & n. 7 (S.D.N.Y.1991). Where there is active concealment, the plaintiff is not required to establish due diligence; the statute of limitations is tolled until the plaintiff has actual knowledge of the defendant's fraudulent conduct. *See Robertson v. Seidman & Seidman,* 609 F.2d 583, 593 (2d Cir.1979); *Butala,* 1997 WL 79845, at *6.

■ Passive concealment occurs when the defendant commits fraud but then takes no further action to disguise the fraud from

---

2. The plaintiffs assert that in this case "fraudulent concealment goes not to whether the statute of limitations should be tolled, but to whether plaintiffs were placed on inquiry notice by any facts in the public domain." (Pl.'s Mem. Law Opp'n Mot. Dismiss Defs. Projectavision, Maslow, Holleran & Ladd at 20.) Thus, the plaintiffs have collapsed their prior argument of equitable tolling into an argument that they were not on inquiry notice of the alleged fraud. Indeed, they concede the point: "[P]laintiffs do not contend that the statute of limitations has been equitably tolled: Rather, plaintiffs contend that the initial complaint was filed within one year of the reasonable discovery of the fraud." (Pl.'s Mem. Law Opp'n Mot. Dismiss Defs. Projectavision, Maslow, Holleran & Ladd at 19 n. 10.) For the reasons explained above and in *Salinger I,* the plaintiffs' claims under Section 10(b) and Rule 10b–5 are barred by the one year statue of limitations because the complaint was not filed within one year of the date by which they were on inquiry notice of the alleged fraud.

the plaintiff. *See Butala,* 1997 WL 79845, at *7; *Clute v. Davenport Co.,* 584 F.Supp. 1562, 1578 n. 4 (D.Conn.1984). In order to establish passive concealment, the plaintiff must prove that the defendant wrongfully concealed the fraud, that the plaintiff exercised due diligence in pursuing discovery of the fraud, and that the plaintiff failed to discover the fraud within the limitations period. *See Butala,* 1997 WL 79845, at *7; *Griffin v. McNiff,* 744 F.Supp. 1237, 1256 (S.D.N.Y.1990), *aff'd,* 996 F.2d 303 (2d Cir. 1993).

In pleading either passive or active concealment, the plaintiff must comply with the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *See Butala,* 1997 WL 79845, at *7; *Greenwald v. Manko,* 840 F.Supp. 198, 202 (E.D.N.Y.1993).

In their Second Amended Complaint, the plaintiffs allege that during the Class Period the defendants fraudulently concealed material facts concerning their wrongful conduct as well as the company's inability to generate substantial licensing revenues or to produce a commercially feasible projection television system. (Second Am. Compl. ¶ 126.) The plaintiffs contend that because of the defendants' fraudulent concealment, the plaintiffs were not given reason to suspect fraudulent wrongdoing, and any inquiry would have been futile. (Second Am. Compl. ¶ 126.) Because the plaintiffs have not alleged any facts showing that they exercised due diligence in pursuing discovery of the alleged fraud, they have not made out a claim for passive concealment. Moreover, although couched in the term of fraudulent concealment, the plaintiffs' allegations amount to no more than an argument that the information in the public domain was insufficient to put them on inquiry notice of the alleged fraud.[3] As explained above, however, the plaintiffs were on inquiry notice of the alleged fraud for more than one year before they filed their complaint.

The plaintiffs have also failed to alleged active concealment because they have not alleged any facts showing that the defendants took subsequent affirmative steps in addition to the original alleged fraud to prevent the plaintiffs from discovering the fraud. As in *Dodds v. Cigna Secs., Inc.,* 12 F.3d 346 (2d Cir.1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994), there are no allegations that the defendants prevented or discouraged the plaintiffs from reviewing the disclosure documents that provided adequate notice of the alleged fraud. *See id.* at 352. Thus, because the plaintiffs have not pleaded either passive or active concealment with particularity, the statute of limitations is not tolled.

Accordingly, the defendants' motion to dismiss the plaintiffs' § 10(b) and Rule 10b–5 claim as time-barred is granted.

### III.

The defendants also assert that the plaintiffs' § 10(b) and Rule 10b–5 claim should be dismissed because the plaintiffs have failed to plead scienter properly pursuant to Fed.R.Civ.P. 9(b). Allegations of securities fraud under § 10(b) and Rule 10b–5 are subject to Rule 9(b)'s requirements regarding scienter. *See Chill v. General Elec. Co.,* 101 F.3d 263, 266 (2d Cir.1996); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994); *Salinger I,* 934 F.Supp. at 1413. To plead scienter properly a plaintiff must allege facts giving rise to a strong inference of fraudulent intent. The inference may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128; *see also Chill,* 101 F.3d at 267; *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 268–69 (2d Cir. 1993), *cert. denied sub. nom, Ross v. ZVI Trading Corp. Employees' Money Purchase Pension Plan,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *Salinger I,* 934 F.Supp. at 1413. Although Rule 9(b) only requires that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," this somewhat more relaxed pleading requirement "must not be

---

**3.** *See supra* note 2.

mistaken for license to base claims of fraud on speculation and conclusory allegations[,]" *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990), in light of Rule 9's purpose of providing defendants with fair notice of the plaintiffs' claims, safeguarding defendants' reputations from improvident allegations of malfeasance, and protecting defendants against strike suits, *see O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991).[4]

 As the Court of Appeals for the Second Circuit has explained:

A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so. Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.

*Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987) (citations omitted), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (in banc).

 The defendants argue that the plaintiffs have not pleaded scienter adequately under either approach. With respect to motive and opportunity, the defendants contend that the plaintiffs' current allegations of motive are substantially similar to the allegations in the First Amended Complaint, which this Court rejected as insufficient. The plaintiffs first allege that the defendants were motivated "to facilitate the many private placements Projectavision required in order to fund its operations in the absence of any revenue stream." (Second Am. Compl. ¶ 40.) However, as this Court held in *Salinger I*,

4. Because this action was pending on the date of enactment of the Private Securities Litigation Reform Act of 1995, the provisions of that statute with respect to pleading state of mind do not apply to this case. *See* Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, §§ 101(b), 108, 109 Stat. 737.

5. The allegation of insider trading by defendant Maslow's children is the only new allegation.

It is not sufficient ... to plead scienter by alleging an abstract desire to enable the company to continue to enjoy a high stock price and thereby ease the difficulties of raising of additional capital. Allegations of these interests are not of themselves sufficient allegations from which a strong inference of fraudulent intent may be drawn.

*Salinger I*, 934 F.Supp. at 1414; *see also San Leandro*, 75 F.3d at 814; *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir.1994).

 The plaintiffs also allege that the defendants were motivated "to inflate the prices of the Company's common stock and thus the value of their own stock and stock options in the Company, as well as the stock holdings of family members, and therefore enable certain family member shareholders of Projectavision, most notably, Maslow's son, Steven C. Maslow, and Maslow's daughter, Renee Maslow Burns, to reap enormous illegal insider trading profits by selling substantial portions of their large holdings of Projectavision common shares at greatly inflated prices during the Class Period."[5] (Second Am. Compl. ¶ 42.) An allegation of a defendant's stock ownership may provide a sufficient motive if supported by allegations of the specific circumstances of the sales of such shares giving rise to a strong inference of an intent to deceive the investing public. *See Acito*, 47 F.3d at 54; *Shields*, 25 F.3d at 1131; *Salinger I*, 934 F.Supp. at 1414. The Second Amended Complaint, however, does not contain any factual allegations regarding the date of any sale, the seller for any particular sale, the number of shares sold, or the price for those shares. Thus, the plaintiffs' allegations regarding stock ownership are deficient because the Second Amended Complaint fails to provide any specifics of such sales of shares that would give rise to the necessary strong inference of fraud.[6]

6. In *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801 (2d Cir.1996), the Court of Appeals found that a complaint failed to allege scienter with particularity against a corporation despite the fact that an executive had realized a profit in excess of $2 million from a sale of stock just before a critical corporate announcement. *See id.* at 814. The Court of Appeals remanded for

The plaintiffs also allege that the "defendants were motivated to engage in the fraudulent issuance of materially false statements to the investing public in order 1) to stir up interest by electronics manufacturers and the electronics market in Projectavision's technology; 2) protect their positions and the substantial compensation and stock option packages they obtained thereby; and 3) inflate and maintain the price of the Company's stock in anticipation of a potential public offering by certain stockholders of the Company's common stock, the registration statement for which was first filed in October 1993." (Second Am. Compl. ¶ 43.) However, as the Court found in *Salinger I*,

> It is true that officers and directors typically have part of their compensation linked to the price of the company's shares and will naturally have an interest in a high stock price. The plaintiffs in this case have alleged such a link. . . . But a generalized interest in executive compensation tied to stock price performance is not a sufficient motive for fraud. *Acito*, 47 F.3d at 54 (noting that increased executive compensation resulting from a higher stock price cannot alone provide a motive for securities fraud or "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions"). Likewise, an unsubstantiated allegation that an executive was motivated to commit fraud in order to maintain the perquisites of corporate rank does not support a strong inference of fraud. *Shields*, 25 F.3d at 1130 ("a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold").

*Salinger I*, 934 F.Supp. at 1414.

Therefore, the Second Amended Complaint fails to plead scienter under the first approach because the plaintiffs have not alleged facts to show the defendants had a motive to commit fraud in compliance with Rule 9(b). The alternative approach is to plead facts constituting strong circumstantial evidence of

conscious misbehavior or recklessness from which a strong inference of fraud may be drawn. The plaintiffs have not pleaded scienter under this approach either.

The plaintiffs argue that they have alleged abundant circumstantial evidence of the defendants' fraudulent intent. However, they rely upon the same categories of circumstantial evidence and substantially the same allegations that the Court rejected as insufficient in *Salinger I*. The plaintiffs rely upon (1) internal Projectavision memoranda criticizing then-President Dolgoff's management skills and delays in completing certain features of the Projector; (2) allegations from Dolgoff's state court complaint that characterize Maslow's public statements as overly optimistic; and (3) the confidential terms of Projectavision's various licensing agreements. As the Court found in *Salinger I*, "the internal memoranda reprimanding Dolgoff for delay and mismanagement are wholly consistent with the repeated admonitions appearing in Projectavision's SEC filings," *Salinger I*, 934 F.Supp. at 1415, "the fact that Dolgoff believed Maslow and other directors were being too optimistic in their public assessments of the speed with which a marketable product could be announced is not inconsistent with the cautionary language appearing in the company's public filings," *id.*, and "the plaintiffs have not identified anything in the license agreements that is inconsistent with the defendants' statements in a way that represents conscious misbehavior of a kind that would support a strong inference of fraud," *id.* at 1416.

The plaintiffs now allege that Projectavision's disclosure of its purchase of "key-man" life insurance for defendant Dolgoff is circumstantial evidence of defendants' fraudulent intent because "Dolgoff, in fact, was incompetent and incapable of bringing to commercial fruition the Projectavision technology." (Second Am. Compl. ¶¶ 76–78). This new allegation fails to support a strong inference of fraud or indeed to support any inference of fraud at all. The plaintiffs do not dispute that "key man" insurance was

further consideration of the insider trading allegation against the executive. *See id.* at 814–15.

In this case, there are no specifics of the trading of any individual defendants or any of their family members.

purchased on defendant Dolgoff, and the act of purchasing "key-man" life insurance on defendant Dolgoff based upon his role as creator of the technology upon which Projectavision was built, co-founder of Projectavision, President of Projectavision from its inception until November 1993, and Chief Scientist until March 1995, suggests only prudence. (Second Am. Compl. ¶ 19.)[7]

The plaintiffs now allege that the defendants had no reasonable basis for stating in Projectavision's 1992 Form 10–K that the company did "not presently anticipate that any significant expenditure of funds for research and development is necessary in order to complete the Projector" as demonstrated by defendant Dolgoff's state court complaint, which alleged that Projectavision had failed to dedicate resources for laboratory equipment and staff. (Second Am. Compl. ¶¶ 57, 120). However, the 1992 Form 10–K elsewhere indicates that certain refinements were still ongoing and that Projectavision might continue the development of the Projector and was in the process of engineering a production model. (Weyman F. Ex. F [Form 10–K for 1992] at 7, 21.) Defendant Dolgoff's view of the resources needed is not inconsistent with the cautionary language appearing in the company's public filings and is not strong circumstantial evidence of fraud.

Accordingly, the plaintiffs have failed to plead scienter under either of the two approaches permitted for securities fraud claims. Therefore, the defendants' motion to dismiss for failure to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b) is granted.[8]

### IV.

In the absence of a primary violation, a plaintiff cannot state a claim for controlling person liability under § 20(a) of the Securities Exchange Act. *See Komanoff v. Mabon, Nugent & Co.,* 884 F.Supp. 848, 859 (S.D.N.Y.1995); *Brown v. Hutton Group,* 795 F.Supp. 1317, 1324 (S.D.N.Y.1992). Thus because the plaintiffs' § 10(b) and Rule 10b–5 claim fails, the plaintiffs' claim for controlling person liability is dismissed.[9]

### V.

The plaintiffs' claims for common law fraud and negligent misrepresentation under New York state law are also dismissed. Because all of the claims arising under federal law are dismissed, the Court declines supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)(3).[10] *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *Block v. First Blood Assocs.,* 988 F.2d 344, 351 (2d Cir. 1993) (no abuse of discretion to refuse supplemental jurisdiction over state law claims when federal claims were dismissed before trial).

### VI.

The plaintiffs seek leave to replead to cure any pleading deficiencies in the Second Amended Complaint. Ordinarily, dismissal based on failure to plead fraud with particularity under Fed.R.Civ.P. 9(b) is without prejudice to a plaintiff's filing an amended complaint to cure the deficient pleading. *See Acito,* 47 F.3d at 54–55 ("Leave to amend should be freely granted, especially where dismissal of the complaint [is] based on Rule 9(b)."); *Luce v. Edelstein,* 802 F.2d 49, 56–57

---

7. To the extent the plaintiffs' allegations are meant to suggest mismanagement, they are not actionable. *See Ciresi v. Citicorp,* 782 F.Supp. 819, 821 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161 (2d Cir.1992); *Salinger I,* 934 F.Supp. at 1415.

8. Because the plaintiffs' § 10(b) and Rule 10b–5 claim is time-barred and the plaintiffs have failed to plead fraud with particularity, it is not necessary to reach the defendants' arguments that the plaintiffs have failed to allege properly loss causation and the required element of reliance.

9. Because the plaintiff's § 20(a) claim is dismissed based on the fact that the plaintiffs' 10(b) and Rule 10b–5 claim fails, it is not necessary to reach the defendants' arguments that the plaintiffs have failed to plead controlling person liability with sufficient particularity.

10. Because the court declines supplemental jurisdiction over the plaintiffs' state law claims, it is not necessary to reach the defendants' argument that the plaintiffs have failed to state a claim for common law fraud and deceit.

236

(2d Cir.1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." (citation omitted)).

Nevertheless, it is not appropriate to grant the plaintiffs' request in this case because the Second Amended Complaint is also dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief may be granted. Moreover, this is the plaintiff's third complaint. Three bites at the apple is enough. *See In re Hyperion Sec. Litig.*, No. 93 CIV. 7179, 1995 WL 422480, at *8 (S.D.N.Y. July 14, 1995), *aff'd sub. nom, Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir.1996); *see also In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 402 (2d Cir.1994); *Fisher v. Offerman & Co., Inc.*, 95 Civ. 2566, 1996 WL 563141, at *9 (S.D.N.Y. Oct.2, 1996). Therefore, leave to replead is denied, and the Second Amended Complaint is dismissed with prejudice.

## CONCLUSION

For the reasons explained above, the defendants' motions to dismiss the Second Amended Complaint are **granted**. The clerk is directed to enter Judgment dismissing this action and closing the case.

**SO ORDERED.**