In re: INITIAL PUBLIC OFFERING SECURITIES LITIGATION

This document relates to:

Amy Liu, Robert Tenney, Robert Tate, Mary Gorton, Carla Kelly, Henry Ciesielski, Ed Grier, Frank Turk, Jennie Papuzza, Stanley Warren, Ellen Dulberger, Craig Mason, Sharon Brewer and Lloyd Hinn, Plaintiffs,

v.

Credit Suisse First Boston Corp., Credit Suisse First Boston (USA), Inc., Credit Suisse First Boston, Credit Suisse Group, Efficient Networks, Inc., eMachines, Inc., Lightspan Partnership, Inc., Tanning Technology Corp., and Tumbleweed Communications Corp., Defendants.

Nos. MDL 1554(SAS), 21 MC 92(SAS), 04 Civ. 3757SAS.

United States District Court, S.D. New York.

June 8, 2004.

John G. Watts, Yearout & Traylor, P.C., Birmingham, AL, for Plaintiffs.

Kristin Linsey Myles, Robert L. Dell Angelo, Munger, Tolles & Olson LLP, San Francisco, CA, Michael L. Hirschfeld, John A. Boyle, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, Randall J. Clement, Sheppard, Mullin, Richter & Hampton LLP, Costa Mesa, CA, Mitchell E. Herr, Holland & Knight LLP, Miami, FL, for Issuer Defendants.

Peter K. Vigeland, Robert W. Trenchard, Wilmer, Cutler & Pickering, New York, NY, for CSFB Defendants.

### SECOND AMENDED OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

Plaintiffs, a group of investors, allege that Defendants, comprising a number of companies and the investment bank Credit Suisse First Boston Corp. ("CSFBC"), engaged in a concerted scheme to defraud the market by publishing artificially deflated revenue projections for the companies in which Plaintiffs invested. This scheme allegedly created a market environment in which investors expected each company to exceed its revenue forecasts.[1] Plaintiffs now move for leave to amend their complaint, and Defendants oppose that motion on the ground that amendment would be futile. Plaintiffs also move to appoint Robert W. Tenney as lead plaintiff pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(a)(3), and Defendants do not oppose that motion.

## II. BACKGROUND

Plaintiff Amy Liu filed her original complaint (the "Initial Complaint") in the Southern District of Florida on February

---

**1.** *See generally* Plaintiffs' Proposed Second    Amended Complaint ("SAC").

28, 2003, alleging that she bought shares from a single issuer, Commerce One, Inc. ("Commerce One").[2] The Initial Complaint sought to bring an action on behalf of purchasers of 49 additional issuers from which Liu had not bought any securities, and alleged that those issuers conspired with CSFBC and various of its affiliates.[3] In June 2003, Plaintiffs filed a First Amended Complaint, adding named plaintiffs Antoine Kasprzak, who purchased shares of Airspan Networks, Inc. ("Airspan") and Robert Tenney, who purchased shares of Commerce One, and dropping 31 of the 50 original issuer defendants.[4] Plaintiffs' claims against Commerce One were dismissed by the Florida court on July 16, 2003, for lack of service, and Plaintiffs voluntarily dismissed their claims against Airspan on July 22, 2003.[5] "On August 12, 2003, when the MDL panel ordered the *Liu* action transferred to this Court [as part of *In re Initial Public Offering Securities Litigation* ], only eight issuers remained in the action."[6] On October 2, 2003, Plaintiffs filed this motion, together with their proposed SAC.

## III. THE PROPOSED SECOND AMENDED COMPLAINT

The following facts are alleged in the SAC, and are deemed true for the purposes of this motion.

### A. The Parties

Plaintiffs allege that the following named plaintiffs purchased securities of various issuers in the open market during each relevant Subclass Period: Amy Liu purchased an undisclosed number of Com-

merce One securities; Antoine Kasprzak purchased 1,000 shares of Airspan securities; Robert Tenney purchased over 20,-000 shares of Commerce One securities; Robert Tate purchased 10,000 shares of Bsquare Corp. ("Bsquare") securities; Mary Gorton purchased 5,350 shares of CacheFlow, Inc. ("CacheFlow") securities; Carla Kelly purchased 3,500 shares of Efficient Networks, Inc. ("Efficient Networks") securities; Henry Ciesielski purchased 200 shares of eMachines, Inc. ("eMachines") securities and 45 shares of McData Corp. ("McData") securities; Ed Grier purchased 7,900 shares of E.piphany, Inc. ("E.piphany") securities; Frank Turk purchased 200 shares of Handspring, Inc. ("Handspring") securities; Jennie Papuzza purchased 200 shares of InterNAP Network Services Corp. ("InterNAP") securities; Stanley Warren, as trustee for the Warren Family Trust, purchased 1,000 shares of Lightspan Partnership, Inc. ("Lightspan") securities; Ellen Dulberger purchased 1,000 shares of SupportSoft, Inc., formerly Support.com, Inc. ("SupportSoft") securities; Craig Mason purchased 500 shares of Tanning Technology Corp. ("Tanning") securities; Sharon Brewer purchased over 4,000 shares of Tumbleweed Communications Corp. ("Tumbleweed") securities; and Lloyd Hinn purchased 1,000 shares of Tumbleweed securities.[7]

Defendant CSFBC is a Massachusetts corporation doing business as an investment bank, and was at all relevant times a registered broker-dealer and member of the National Association of Securities

---

**2.** *See* Issuer Defendants' Opposition to Motion to Amend Complaint ("Issuer Opp."), at 2.

**3.** *See id.*

**4.** *See id.,* at 3.

**5.** *See id.*

**6.** *Id.*

**7.** *See* SAC ¶¶ 8–23.

Dealers, Inc. ("NASD").[8] CSFBC was a lead underwriter for the IPOs of each of the following issuers: Airspan, Bsquare, CacheFlow, Commerce One, eMachines, Efficient Networks, E.piphany, Handspring, InterNAP, Lante Corp. ("Lante"), Lightspan, McData, New Focus, Inc. ("New Focus"), SupportSoft, Tanning and Tumbleweed (collectively, the "Issuers").[9] CSFBC is a wholly-owned subsidiary of defendant Credit Suisse First Boston (USA), Inc. ("CSFB–USA"), a Delaware corporation, which is in turn a wholly-owned subsidiary of defendant Credit Suisse First Boston, Inc. ("CSFBI"), also a Delaware corporation.[10] CSFBI is jointly owned by defendant Swiss bank Credit Suisse First Boston ("CS") and defendant Swiss holding company Credit Suisse Group ("CSG").[11] CS is wholly owned by CSG.[12] On or about November 3, 2000, CS acquired an underwriter, Donaldson Lufkin & Jenrette, Inc. ("DLJ"), which subsequently became CSFB–USA.[13] "CSFB Defendants" comprises CSFBC, CSFBI, CSFB–USA, CS, and CSG.

Plaintiffs name as defendants five of the sixteen Issuers (the "Issuer Defendants"), to wit: Efficient Networks, eMachines, Lightspan, Tanning, and Tumbleweed. Plaintiffs do not name as Issuer Defendants the other eleven Issuers managed by the CSFBC Defendants, specifically Airspan, Commerce One, Bsquare, CacheFlow, McData, E.piphany, Handspring, InterNAP, Lante, New Focus, and SupportSoft.[14]

## B. The Conspiracy

Plaintiffs allege that various individuals affiliated with the Issuer Defendants who signed the registration statements associated with each company's IPO (the "Issuer Individuals")[15] "directly participated and [were] integrally involved in the management of the Issuer, [were] directly involved in the day to day operations of the Issuer and [were] privy to confidential proprietary information concerning the Issuer," and that, as such, those individuals are properly treated as a group for pleading purposes.[16] Plaintiffs further allege that each of the Defendants knowingly made misstatements and omissions on which they knew members of the Class were likely to rely, and thus are subject to joint and several liability under the PSLRA.[17] Plaintiffs allege that CSFBC's Technology Group (operated and managed by Frank Quattrone, George Boutros and William Brady), CSFBC and each of the Issuer Defendants "pursued a conspiracy, common enterprise, and/or common course of action and acted in concert with and

8. *See id.* ¶ 24.

9. *See id.;* Ex. A to SAC.

10. *See id.* ¶¶ 25–26.

11. *See id.* ¶ 27.

12. *See id.*

13. *See id.* ¶ 28.

14. *Id.*

15. The Issuer Individuals are Mark A. Floyd, Efficient Network's CEO, President and Chairman; Jill S. Manning, Efficient Network's Vice President and CFO; John T. Kernan, eMachines' CEO and Chairman; Steven H. Miller, eMachines' CFO, Secretary, and Vice President; John T. Kernan, Lightspan's CEO and Chairman; Kathleen R. Mcelwee, Lightspan's Vice President and CFO; Larry G. Tanning, Tanning's CEO, President and Chairman; Henry F. Skelsey, Tanning's Vice President, CFO and member of the Board of Directors; Jeffrey C. Smith, Tumbleweed's CEO, President and Chairman; and Joseph C. Consul, Tumbleweed's Vice President and CFO.

16. *See id.* ¶ 39.

17. *See id.* ¶¶ 252–53.

conspired with one another, in furtherance of their common plan...."[18] Quattrone, Boutros and Brady, together with the Technology Group and CSFBC, were the central actors in the conspiracy, creating separate but nearly identical schemes involving each of the Issuers, and developed the "system of fraud" alleged by Plaintiffs.[19] "Each Issuer Individual, because of his or her position of control and authority ... was able to and did control the contents of the various quarterly and annual financial reports, research reports, revenue data, SEC filings, and press releases for the Issuer with which he or she was employed."[20] The central core of conspirators provided each Issuer Defendant "with copies of that Issuer's [allegedly fraudulent] reports, releases, and filings ... prior to or shortly after their issuance and the Issuer Individuals had the ability and opportunity to prevent their issuance or to cause them to be corrected." The issuance of these reports "manipulated, misrepresented, and failed to disclose the true facts regarding Issuers' revenues, earnings, markets, business, management, financial condition, and future prospects."[21] Plaintiffs allege that each defendant acted either "knowingly or in such a reckless or grossly negligent manner as to constitute a fraud and deceit upon Issuer's shareholders."[22]

### C. Notice of Fraud

Plaintiffs allege that they were not put on notice of the alleged wrongdoing until counsel, while investigating the Initial Complaint, uncovered the scheme in February 2003.[23] Plaintiffs further allege that the alleged fraud had never been the subject of media attention before the Initial Complaint was filed, and further that CSFB and Quattrone affirmatively "undertook to conceal from Government regulators and the investing public the fraudulent scheme."[24] Plaintiffs contend that "many of the essential facts reflecting the fraudulent scheme were not discovered until March of 2003, when Plaintiffs' counsel received additional documents detailing the fraud."[25] Plaintiffs further contend that they did not discover Quattrone's and CSFBC's spoliation and concealment of evidence until after the Initial Complaint was filed.[26]

### D. The Class

Plaintiffs bring this suit on behalf of themselves and the members of a putative class (the "Class") comprising all "persons and entities who purchased common stock of each Issuer" during the Class Period.[27] The Class Period is itself composed of sixteen Subclass Periods, which correspond to purchases made in the aftermarkets for each of the sixteen Issuers.[28] The Class excludes all purchasers who bought stock during the IPO of each Issuer, all Defendants and persons or entities controlled by them, any conspirators identified within the SAC but not sued, and all purchasers who sold their stock

18. *Id.* ¶ 41.

19. *Id.* ¶ 42.

20. *Id.* ¶ 43.

21. *Id.* ¶ 44.

22. *Id.* ¶ 45.

23. *See id.* ¶ 46.

24. *Id.* ¶¶ 46–47.

25. *Id.* ¶ 49.

26. *See id.* ¶ 50.

27. *Id.* ¶ 52.

28. *See id.* ¶ 53.

for a profit during the Class Period.[29] Each Issuer's securities were actively traded on the NASDAQ during each Subclass Period, and the Defendants conspired to manipulate the publicly available information regarding each issue to create false expectations of "upside surprise."[30] Plaintiffs allege that the members of the Class are so numerous that joinder would be impracticable, that the named plaintiffs' claims are typical of those of Class members as a whole, and that the named plaintiffs will adequately protect the interests of the class as a whole, and have retained counsel competent in class and securities litigation.[31]

## E. The Alleged Fraud

Plaintiffs allege that, while marketing its services to prospective Issuers, the Technology Group introduced a scheme called "Pop and Performance," which is referenced by name on a number of marketing slides used by the Technology Group.[32] The "Pop"—a strong rise in share price in the aftermarket immediately following an IPO—occurred because Defendants conducted each IPO at a deep discount compared to the actual expected value of the issue.[33] Defendants informed certain potential purchasers of this underpricing, and those individuals immediately bought large quantities of the new issue at deeply discounted prices, causing a large price increase immediately following the offering, which attracted other purchasers to the security.[34] Plaintiffs allege that the "Performance" in the Technology Group's formula refers to a system involving the dissemination of artificially low revenue forecasts with the knowledge that the actual revenue reports would exceed those forecasts, coupled with the dissemination of statements encouraging the public to buy each stock because of its strong revenue growth or potential for upside surprise.[35]

### 1. The CSFB Defendants

Plaintiffs allege that CSFBC had both the opportunity and motive to commit fraud.[36] CS hired Quattrone and other investment bankers to form the Technology Group, and granted Quattrone "unusual autonomy" to structure the practice of the Technology Group.[37] Quattrone established a separate research department within the Technology Group (the "Technology Research Team"), which reported directly to Quattrone.[38] The Technology Research Team included a number of equity research analysts, including some members who enjoyed such good reputations that their public reports regularly influenced the prices of securities on which

---

29. *Id.* The Subclass dates for claims arising from Plaintiffs' purchase of each Issuer's securities follow: Airspan, 7/20/00 to 1/31/01; Bsquare, 12/7/00 to 7/6/01; CacheFlow, 12/7/00 to 2/1/01; Commerce One, 12/7/00 to 3/2/01; eMachines, 3/24/00 to 6/19/00; Efficient Networks, 7/15/99 to ½/01; E.piphany, 12/7/00 to 3/2/01; Handspring, 12/7/00 to 3/27/01; InterNAP, 12/7/00 to 3/6/01; Lante, 2/11/00 to 10/3/00; Lightspan, 2/10/00 to 8/16/00; McData, 8/9/00 to 4/19/01; New Focus, 12/7/00 to 3/5/01; Support.com (SupportSoft), 7/19/00 to 4/18/01; Tanning, 7/23/99 to 7/5/00; and Tumbleweed, 8/6/99 to 10/18/00.

30. *See id.* ¶¶ 54–55.

31. *See id.* ¶¶ 56–58.

32. *See id.* ¶ 61.

33. *See id.*

34. *See id.*

35. *See id.* ¶ 62.

36. *See generally id.* ¶¶ 63–99.

37. *Id.* ¶¶ 64, 66.

38. *See id.* ¶¶ 67–69.

they reported.[39] The Technology Group used the reputation of these "All–Star" analysts "to lure potential clients to its IPO practice."[40] Quattrone and the other investment bankers in the Technology Group influenced the content of the reports produced by the Technology Research Team, for each of the companies brought public by the Technology Group.[41] The Technology Group participated only in IPOs for which CSFBC was either the lead manager or one of multiple "co-lead" managers.[42] CSFBC's leadership position in these offerings enabled it to dominate many aspects of the offering, including the conduct of due diligence regarding each Issuer, the review and dissemination of performance forecasts, and the final determination of the initial offering price of the stock.[43]

Plaintiffs allege that CSFBC, Quattrone and the members of the Technology Group each had direct incentives to maximize the number of offerings they administered and ensure that each issuer's stock price rose after its initial offering.[44] CSFBC and the Technology Group "benefitted from the fraud in the following ways: (1) payment of investment banking fees; (2) payment related to secondary offerings; (3) profits (actual and expected) from secret pre-IPO investments; (4) allocations of lucrative IPO shares; (5) increased commissions as a result of market making activity; and (6) other ancillary benefits, including bonuses, publicity and the like."[45] Plaintiffs fur-

ther allege that CSFBC collected fees for conducting the IPOs for the Issuers in excess of $148,474,000.[46] Quattrone and the other members of the Technology Group also profited from increased business; they enjoyed a profit-sharing agreement with CSFBC which entitled them to a large proportion of the revenue generated by the Technology Group, a sum which may have been as large as $500,000,000 in 1999.[47] CSFBC also compensated its research analysts for investment business they helped generate, including a share of the fees collected by the Technology Group.[48]

CSFBC, Quattrone and the Technology Group also benefitted by the increased demand both for the stocks they successfully promoted and for their investment services.[49] Quattrone maintained a list of clients within the Technology Group, and divided lucrative IPO allocations among those clients, which were referred to internally as the "Friends of Frank," a play on the more common "friends and family" plans whereby underwriters distribute limited numbers of IPO shares to preferred investors.[50] A number of hedge funds established by Quattrone and his associates were among the beneficiaries of these IPO allocations.[51] CSFBC also profited directly from Quattrone's investment activities by giving Quattrone $25,000,000 each year to invest on CSFBC's behalf in potential

---

**39.** *See id.* ¶¶ 66–67, 70–71.

**40.** *Id.* ¶ 72.

**41.** *See id.* ¶¶ 74–76.

**42.** *See id.* ¶ 77.

**43.** *See id.* ¶ 78.

**44.** *See id.* ¶¶ 79–80.

**45.** *Id.*

**46.** *See id.* ¶ 81.

**47.** *See id.* ¶¶ 82–85.

**48.** *See id.* ¶¶ 86–87.

**49.** *See id.* ¶¶ 88–90.

**50.** *Id.* ¶¶ 91–92.

**51.** *See id.* ¶¶ 93–95.

underwriting clients that were about to go public.[52]

Plaintiffs further allege that CSFBC had actual knowledge of its wrongdoing.[53] The Technology Group highlighted its success in creating "Pop and Performance" in its presentations to prospective clients.[54] The Technology Group knowingly set its IPO prices below the issue's expected value, and communicated this price depression to CSFBC's sales staff, which in turn used this information to create interest in each Issuer's IPO.[55] The Technology Group conducted detailed valuation analyses to form its opinions of the correct value of each Issuer's company and to determine a corresponding projected stock price, and referred to its purposeful understating of that estimate, in various internal memos, as the "IPO Discount."[56] The Technology Group presented the underpricing scheme to each Issuer, describing the purpose and effect of understating the price for the IPO, and Issuers subsequently adopted the discounted financial projections into the forecast information they disseminated before their IPOs.[57] CSFBC's sales force then instructed the public that each Issuer would likely enjoy strong revenue growth.[58] Moreover, after the required quiet period following each IPO, the Technology Research Team's analysts published research reports incorporating the discounted financial projections, and recommending each issue as either a "Buy" or a "Strong Buy," as well as highlighting each issue's potential for future upside surprise.[59]

In July of 1998, CS agreed to establish a venture capital fund (the "Venture Fund") managed by Quattrone, Boutros and Brady, contributing 99% of the fund's equity through Merchant Capital, a CS subsidiary, and claiming 80% of the profits of the fund.[60] Quattrone, Boutros and Brady, doing business as QBB Management ILLC ("QBB Management"), contributed 1% of the equity for the Venture Fund and reaped 20% of its profits.[61] Merchant capital loaned QBB Management the 1% it needed to establish the Venture Fund.[62] Beginning in the fall of 1999, Technology Group employees had the opportunity to share in the investments of the Venture Fund through a series of corporations created for the sole purpose of holding securities in issuers that the Technology Group was about to take public.[63] Eventually, Merchant Capital established two more funds with participation from CS and CSFBC employees.[64]

## 2. The Issuer Defendants

Despite the initial underpricing of their IPOs, the Issuer Defendants profited from the success of Defendants' scheme.[65] Large price gains in early trading increased publicity regarding the Issuers, and sustained price growth increased each

52.  *See id.* ¶¶ 96–97.

53.  *See generally id.* ¶¶ 100–28.

54.  *See id.* ¶ 100.

55.  *See id.* ¶¶ 101–03.

56.  *Id.* ¶¶ 107–12, 119–20.

57.  *See id.* ¶¶ 113–18, 121–22.

58.  *See id.* ¶¶ 126–27.

59.  *See id.* ¶ 128.

60.  *See id.* ¶¶ 129–41.

61.  *See id.* ¶ 141.

62.  *See id.* ¶ 145.

63.  *See id.* ¶¶ 146–47.

64.  *See id.* ¶¶ 151–56.

65.  *See id.* ¶¶ 157–61.

Issuer's bargaining power in future merger or acquisition negotiations, as well as increasing the profitability of any future public offerings.[66] The Issuer Individuals also profited from stock price increases because higher stock prices increased the value of their own substantial stock holdings.[67] The Technology Group and CSFBC further enticed each Issuer Defendant with the prospect of "piggyback" offerings taking advantage of the artificially high prices in the aftermarket.[68] These "piggyback" offerings also allowed various Issuer Individuals to package some of their stock with stock from the Issuer Defendants in offerings as soon as ninety days after the initial offering, circumventing the usual six month waiting period before which insiders would not have been permitted to sell their stock in the market.[69] Each Issuer Defendant was presented with the opportunity to defraud the public when CSFBC presented them with the unusual structure of the Technology Group, which allowed investment bankers to exert direct influence over the reports of associated analysts.[70]

Plaintiffs allege that each Issuer Defendant had actual knowledge of its fraudulently understated prices because it had engaged in detailed discussions with the Technology Group regarding IPO pricing, including the advantages of pricing an IPO artificially low.[71] Each Issuer Defendant was similarly aware of the discounting of revenue forecasts "because the Technology Group had explained to each Issuer . . .

the purpose and strategy of discounting forecasted revenues in conjunction with the IPO."[72] Each Issuer Defendant had delivered to the Technology Group's investment bankers the Issuer's projected income statement, and was aware that the predictions issuing from the Technology Group's analyst wing substantially differed from those internally generated forecasts.[73]

### 3. The Sales Memo

Plaintiffs allege that the Technology Group's standard practice was to communicate the actual value of an issue and the discounted proposed offering price to CSFBC's sales staff using two documents, an internal "Equity Sales Book" and a "Sales Points Broadcast" (collectively referred to as the "Sales Memo").[74] The Sales Memo, which provided "the basis for sales pitches to potential buyers of Issuers' stock," failed to describe the discounting of each Issuer's offering price.[75] Plaintiffs allege that this omission made CSFBC's statements regarding the offering price of each issue misleading.[76] The Sales Memo also contained statements reflecting the revenue forecast for each Issuer, which plaintiffs contend was fraudulently understated.[77] Plaintiffs allege that CSFB and the Issuer Defendants made these misstatements and omissions with actual knowledge, and thus substantially altered the total mix of information available to

66. *See id.* ¶¶ 157–58.

67. *See id.* ¶ 159.

68. *See id.* ¶ 160.

69. *See id.* ¶ 161.

70. *See id.* ¶¶ 162–64.

71. *See id.* ¶¶ 113–4, 165–67.

72. *Id.* ¶ 168.

73. *See id.* ¶¶ 116, 169–70.

74. *Id.* ¶ 102.

75. *Id.* ¶¶ 175–76.

76. *See id.* ¶¶ 177–80.

77. *See id.* ¶¶ 178–83; Ex. E to SAC.

the investing public.[78]

### 4. The Issuers' Prospectuses

Plaintiffs allege that each Issuer's prospectus, prepared for the Issuer's IPO, contained numerous false statements regarding principal factors considered in determining the offering price.[79] Each prospectus omitted the fact that CSFBC, the Technology Group and the Issuer had agreed to offer the securities at a deep discount from the actual expected value of the securities.[80] Each prospectus further failed to state that the nature and severity of the discount had been communicated to "select members of the investing public" to create interest in the IPO.[81] Plaintiffs again allege that CSFBC had actual knowledge of every misstatement and omission within each Issuer's prospectus, that each Issuer Defendant had actual knowledge of misstatements and omissions within its own prospectus, and that those misstatements and omissions substantially altered the total mix of information available to the investing public.[82]

### 5. CSFBC's Research Reports

"CSFBC published research reports for each Issuer that contained statements discussing the revenues of each Issuer, including a projected income statement for each Issuer."[83] These statements did not reveal that forecasted quarterly and annual revenues had been artificially discounted below expected levels.[84] Plaintiffs allege

that the lack of such warnings led investors to believe the fraudulent revenue forecasts and perceive that the securities were actually outperforming analysts' expectations.[85] Furthermore, CSFBC made statements within the same research reports that heralded the strong or increasing revenue growth of the Issuer, including statements that the revenue estimates for that Issuer were likely to be beaten by actual revenues.[86] Plaintiffs allege that CSFBC and the Issuer Defendants knew the analysts' reports to be fraudulent when they were made, and that the statements substantially altered the total mix of information available to the investing public.[87]

### 6. Fraudulent Scheme and Deceitful Course of Business

Plaintiffs allege that CSFBC engaged in the conduct described above as part of its standard business conduct, and that its scheme was so successful and pervasive that it saturated the market with unreasonably high expectations for securities offerings managed by CSFBC and the Technology Group.[88] CSFBC made similar misstatements in its Sales Memos for each Issuer, misrepresenting the actual process by which it determined the offering prices and omitting its application of a deep discount to its actual valuation of the securities.[89] CSFBC further misstated, in each Sales Memo, its actual revenue forecasts for that Issuer, and omitted the fact that those revenue forecasts had been artificial-

---

78. *See id.* ¶¶ 183–84, 186.

79. *See id.* ¶ 187; Ex. C to SAC.

80. *See id.* ¶¶ 188–89.

81. *Id.* ¶ 190–91.

82. *See id.* ¶¶ 192–93, 195.

83. *Id.* ¶ 196; *see also* Ex. D to SAC.

84. *See id.* ¶ 197.

85. *See id.* ¶ 198.

86. *See id.* ¶ 199.

87. *See id.* ¶¶ 200–01, 203–04.

88. *See id.* ¶¶ 205–07.

89. *See id.* ¶ 208.

ly discounted.[90] CSFBC and each Issuer Defendant omitted to disclose the fact that they had discussed and established the offering price at a substantial discount.[91] Moreover, CSFBC omitted to disclose that its discounting process had been communicated to select members of the investing public to create interest in the Issuers' securities.[92] These repeated misstatements and omissions were part of CSFBC's ongoing scheme to condition the market to expect "Pop and Performance" from offerings it managed.[93]

### 7. Reliance and Transaction Causation

Plaintiffs relied on the integrity of statements made in the Sales Memo and the research analysts' reports, issued in the aftermarket for each Issuer's stock, in addition to each Issuer's prospectus in deciding to purchase shares of the Issuers' securities.[94] Misstatements and omissions contained within those documents artificially created an active and rising market for the Issuers' securities, which in turn led Plaintiffs to buy shares in circumstances where they would not have bought them at all, or would have bought them at significantly lower prices, had they not been misled by Defendants.[95] CSFBC and the Issuer Defendants had a fiduciary duty to Plaintiffs and breached that duty by misstating or omitting important information from the documents they disseminated and produced.[96]

### 8. Loss Causation

Plaintiffs allege that they were damaged because they paid artificially inflated prices for the Issuers' securities that then fell when Defendants' fraudulent scheme was disclosed.[97] The market value of the Issuers' securities rose during the Class Period because their companies consistently exceeded revenue forecasts, and the market was conditioned to anticipate such surprises, driving the price of shares ever higher.[98] "During the class period, the market value of technology IPO [s]tocks w[as] based on forecasted (forward) revenues."[99] CSFBC noted these pricing effects in its research reports and Sales Memos, stating that "Like many high growth communications equipment and technology IPOs, [CacheFlow's] value is based on forward revenue multiples."[100] "CSFBC and the Issuer [Defendants], by means of the[ir] misstatements and omissions ... manipulated the revenue forecasts of each Issuer so that the Issuer's actual results would continually exceed the forecasts thereby increasing the 'premium' built into the stock price."[101]

The scheme of setting revenue forecasts so that they would be exceeded by actual revenues did not continue indefinitely; the fraud effectively ended when one of three events occurred: (1) the Issuer reported quarterly revenues that failed to exceed projected revenues; (2) the company announced prior to a full quarterly report

---

90. *See id.* ¶ 209.

91. *See id.* ¶ 210.

92. *See id.* ¶ 211.

93. *See id.* ¶ 212.

94. *See id.* ¶¶ 213–15.

95. *See id.*

96. *See id.* ¶¶ 217–18.

97. *See id.* ¶ 219.

98. *See id.* ¶¶ 220–22.

99. *Id.* ¶ 220.

100. *Id.*

101. *Id.* ¶ 223.

that its revenues would not meet projected revenues; or (3) when analysts revised downward their own published estimates (collectively, "Disclosing Events").[102] The occurrence of one or more Disclosing Events triggered the end of each Subclass Period.[103] Each Issuer's stock price declined substantially after its Disclosing Event, with the sixteen Issuers' stock prices declining an average of 24 percent in the first day after a Disclosing Event.[104]

### 9. CS and CSG

Plaintiffs allege that CS and CSG participated in CSFBC's fraud.[105] CS directly employed Quattrone, Boutros, Brady and the rest of the Technology Group and created venture investment funds for QBB Management and the Technology Group through its wholly-owned subsidiary, Merchant Capital, whose activities it directed and authorized at all relevant times.[106] The venture funds provided by CS allowed the Technology Group to attract new clients and enabled members of the Technology Group to profit directly from their own activities, which had not previously been part of the business of either CS or CSG.[107] CS and CSG, knowing the actions of the Technology Group were fraudulent, attempted to shield themselves from liability through their creation and structuring of the venture funds.[108] CS itself assisted Quattrone, Boutros, Brady and the rest of the Technology Group in their scheme by committing:

> the following acts: (1) CS established and continued to operate the initial venture funds before alternative structures were proposed, (2) CS continued to establish and operate new venture funds utilizing the alternative structures, (3) CS appointed ... Frank Quattrone [ ] to the Board of its same subsidiary (Merchant Capital) which it used to provide capital to these venture funds, (4) CS directed its subsidiary (Merchant Capital) to continue and expand its venture fund activities with [Quattrone, Boutros and Brady] and the Technology Group, including the formation of new employee venture funds, and (5) CS created special sub-committees in its subsidiary (Merchant Capital) for the purposes of managing newly formed venture funds with the Technology Group and QBB.[109]

Plaintiffs allege that CSG also participated in the fraudulent activities of the Technology Group by authorizing Merchant Capital to undertake its alleged improper activities.[110] The Technology Group could not have carried out its fraudulent scheme without CS and CSG's involvement, and CS and CSG had at all times the power to prevent or terminate the venture fund activities of QBB Management and the Technology Group.[111]

### 10. Insider Trading

The CSFB Defendants sold the stock of each Issuer in the aftermarket through the hedge funds established by Quattrone and through the venture funds created by QBB Management and Merchant Capital.[112] At that time, the CSFB Defendants were in

---

102. *See id.* ¶¶ 224–25.

103. *See id.* ¶¶ 53, 225.

104. *See id.* ¶¶ 226–27.

105. *See id.* ¶¶ 228–40.

106. *See id.* ¶¶ 229–32.

107. *See id.* ¶¶ 233, 235–36.

108. *See id.* ¶ 235.

109. *Id.* ¶ 237.

110. *See id.* ¶ 238.

111. *See id.* ¶ 239.

112. *See id.* ¶ 241.

possession of material nonpublic information deriving "both from their fiduciary role as underwriter of each Issuer's IPO and from their complicity with each Issuer in the public dissemination of fraudulent information regarding the expected financial performance of the Issuer."[113] The nonpublic information possessed by the CSFB Defendants at the time of their stock sales included the following: (1) that CSFBC and the Issuer had artificially discounted the initially forecast revenues to enable actual revenues to exceed the forecasts and "thus create the fiction of 'upside surprise' "; (2) that the Issuers had in fact performed better than the analysts' forecasts; (3) that these upside surprises had a material positive effect on stock price; (4) that this effect was cumulative where stocks had exceeded their artificially depressed forecasts for multiple quarterly periods, resulting in ever higher stock prices; (5) that upward revisions of analysts' forecasts had been pre-planned and were part of a scheme to allow analysts to make upward revisions while still allowing actual revenues to exceed discounted forecasts; (6) that these artificial upward estimate revisions had a material positive effect on stock prices; (7) that such effects were cumulative where multiple upward revisions had taken place; and (8) that Defendants' artificial manipulation of the market resulted in an inflated price for those selling stock in the aftermarket.[114] Plaintiffs allege that those Issuer Defendants that had secondary offerings (Efficient Networks and Tumbleweed) possessed material nonpublic information to the effect that the market price for their stock was artificially inflated by Defendants' scheme, and sold stock in secondary offerings at prices that were in turn inflated by their deceptive behavior.[115]

### 11. Destruction of Evidence

Plaintiffs allege that members of the Technology Group, in anticipation of litigation, attempted to eliminate evidence of their wrongdoing at the direction of senior management, purposefully destroying records, files and other evidence relating to violations of securities law.[116] On December 5, 2000, Quattrone circulated an e-mail within the Technology Group urging the destruction of documents due to a pending investigation.[117] Plaintiffs allege upon information and belief that, "[d]espite circulation of a memo by CSFBC's counsel decrying document destruction . . . CSFBC condoned the continued destruction of evidence. In fact, after circulation of the CSFBC December 5, 2000 memo, a copy of the memo *urging destruction* was taped to the Technology Group shredder, where it remained despite the memo by CSFBC's counsel."[118]

### F. Claims for Relief

Plaintiffs assert the following claims on behalf of themselves and the Class:

### 1. 10b–5 Claims

Plaintiffs assert two causes of action under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act") and Rule 10b–5, 17

---

**113.** *Id.* ¶¶ 242–43.

**114.** *Id.* ¶ 244–45.

**115.** *See id.* ¶¶ 246–48.

**116.** *See id.* ¶ 249.

**117.** *See id.* ¶ 250. The circulation of this memo was central to Quattrone's May 3, 2004 conviction for obstructing a grand jury, obstructing federal regulators and witness tampering. *See* Randall Smith, *Quattrone Found Guilty On 3 Counts in Big U.S. Win,* Wall St. J., May 4, 2004, at A1.

**118.** *Id.* ¶ 251 (emphasis added).

C.F.R. § 240.10b–5, promulgated thereunder.[119]

*First,* that the CSFB Defendants violated Rule 10b–5 by engaging in a scheme pursuant to which they issued false and misleading statements to the investing public in violation of their duty to disseminate accurate and truthful information, knew or recklessly disregarded the fact that such statements would affect the price and marketability of each Issuer's common stock, and thus caused Plaintiffs to purchase stock at artificially inflated levels which thereafter fell, damaging Plaintiffs.[120]

*Second,* that the Issuer Defendants violated Rule 10b–5 by engaging in a scheme pursuant to which they issued false and misleading statements to the investing public in violation of their duty to disseminate accurate and truthful information, knew or recklessly disregarded the fact that such statements would affect the price and marketability of each Issuer's common stock, and thus caused Plaintiffs to purchase stock at artificially inflated levels which thereafter fell, damaging Plaintiffs.[121]

### a. Misrepresentations Alleged in Plaintiffs' 10b–5 Claims

In support of these claims, Plaintiffs allege that Defendants "issued, caused to be issued, and participated in the issuance of false and misleading statements to the investing public ... and failed to disclose material facts to the public," thereby implementing their scheme.[122] Plaintiffs allege with particularity the following misstatements and omissions, which provide the basis for Plaintiffs' claims.

The CSFB Defendants, through the Technology Group's analysts, and with the knowledge of the Issuer Defendants, issued research reports containing understated quarterly and annual revenue forecasts and projected income statements for each Issuer.[123] The research reports contained statements regarding the strong or increasing revenue growth of each Issuer, including statements "that the revenue estimates for Issuers might be under-estimated, or overly conservative, or likely to be beaten, or susceptible to an 'upside surprise,'" or other statements reflecting the discounting of revenue estimates.[124] However, these documents failed to reveal the extent to which the revenue forecasts were artificially depressed.[125]

CSFB's sales force disclosed information from the Sales Memos to certain members of the investing public, predicting revenue growth.[126] The Sales Memos generally stated or implied that the IPO price for each Issuer was low, but failed to disclose "that the discounting ... was actually greater than was indicated in the Sales Memo."[127] The Sales Memos contained statements regarding the future forecasted revenue for each Issuer, including projected income statements, but failed to disclose that the revenue forecasts had been substantially discounted.[128] The Sales Memos also included "selling statements

---

119. Plaintiffs bring no claims under the Securities Act of 1933.

120. *See id.* ¶¶ 254–64.

121. *See id.* ¶¶ 265–75.

122. *Id.* ¶ 257.

123. *See id.* ¶¶ 70, 74, 114, 122–24, 128, 196.

124. *Id.* ¶ 199.

125. *See id.* ¶¶ 197–98.

126. *See id.* ¶¶ 102–03, 126–27. Statements made in the Sales Memo for each Issuer are described with particularity in Ex. E to SAC.

127. *Id.* ¶ 176.

128. *See Id.* ¶ 179.

instructing Investors to purchase Issuer's stock because Issuer was going to experience strong and/or increasing revenue growth," occasionally noting that revenue estimates were conservative, but omitting the fact that the forecasts were substantially depressed.[129]

The Issuers' prospectuses described the means by which the offering price was determined, but failed to state that the actual offering price was substantially discounted from the calculated appropriate price to ensure initial high performance.[130]

### b. Fraudulent Scheme Alleged in Plaintiffs' 10b–5 Claims

Plaintiffs further allege that all Defendants shared the common purpose of "creating the illusion of ever rising stock prices so that [ ] Defendants could profit from the sale of resulting over-priced securities owned by them and induce Plaintiffs and the members of the Class to purchase common stock at artificially inflated prices."[131]   The CSFB Defendants additionally sought to "profit from increased underwriting and market making fees resulting from the price manipulation."[132]

Plaintiffs allege that CSFBC's repetition of material misstatements for each Issuer it managed constituted a deceitful course of business.[133]   Plaintiffs further contend that each misrepresentation was an individual component of the CSFB Defendants' larger fraudulent scheme to ensure "Pop and Performance" for the issues they handled.[134]

### 2. Plaintiffs' 20(a) Claims

Plaintiffs assert four additional claims under section 20(a) of the Exchange Act, 15 U.S.C. § 78t.

*First,* that CSFBC violated section 20(a) through its control of the Technology Group and power to direct the operations of the Technology Group, and through its failure to fulfill its duty to the public as an underwriter and broker with respect to the actions of the Technology Group.[135]

*Second,* that CS violated section 20(a) through its control and ownership of the Technology Group and power to direct the operations of the Technology Group and its failure to fulfill its duty to the public as an investment advisor, broker or dealer, with respect to the actions of the Technology Group.[136]

*Third,* that CSG violated section 20(a) through its control and ownership of the Technology Group and CSFBC, its power to direct the operations of the Technology Group and CSFBC and its failure to fulfill its duty to the public as an investment advisor, broker or dealer, with respect to the actions of the Technology Group and CSFBC.[137]

*Fourth,* that each Issuer Defendant violated section 20(a) through its employment and control of the Issuer Individuals during the perpetration of the Issuer Individuals' alleged fraud, and through the Issuer Defendants' power to control or influence the specific corporate policy that governed its business operations.[138]

129.   *Id.* ¶ 104.  *See also id.* ¶¶ 181–82.

130.   *See id.* ¶¶ 187–189, Ex. C to SAC.

131.   *Id.* ¶¶ 256, 267.

132.   *Id.* ¶ 256.

133.   *Id.* ¶¶ 205–06.

134.   *Id.* ¶ 212.

135.   *See id.* ¶¶ 276–80.

136.   *See id.* ¶¶ 281–85.

137.   *See id.* ¶¶ 286–90.

138.   *See id.* ¶¶ 291–94.

## IV. LEGAL STANDARD

### A. Leave To Amend

Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading "only by leave of court or by written consent of the adverse party; and leave should be freely given when justice so requires." [139] The decision whether to grant leave to amend is within the sound discretion of the court. [140] As a general rule, however, "[w]hen a cause of action is dismissed because of pleading deficiencies, the usual remedy is to permit plaintiff to replead its case. This policy is especially appropriate in the context of claims dismissed under Rule 9(b) because the law favors resolving disputes on their merits." [141]

■ Leave should only be denied for reasons such as undue delay on the part of the moving party, bad faith, repeated failure to cure deficiencies in pleading, undue prejudice or futility of the amendment. [142] "[W]here leave to amend or replead has been repeatedly granted, it may be appropriate to deny leave. Although the Rules eschew 'technical forms of pleading,' Fed. R.Civ.P. 8(e)(i), where pleading deficiencies have been identified a number of times and not cured, there comes a point where enough is enough." [143] Where a defective complaint cannot be cured by amendment, such amendment is futile, and leave to amend is inappropriate. [144]

### B. Standing

■ Only an actual purchaser or seller of a security has standing to sue under section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. [145] "In order to maintain a class action, Plaintiffs must first establish that they have a valid claim with respect to the shares that

---

**139.** Fed.R.Civ.P. 15(a); *see also Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Nerney v. Valente & Sons Repair Shop*, 66 F.3d 25, 28 (2d Cir.1995); *In re Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 119 (S.D.N.Y.2002).

**140.** *See Foman*, 371 U.S. at 182, 83 S.Ct. 227; *Rush v. Artuz*, No. 00 Civ. 3436(LMMDF), 2001 WL 1313465, at *5 (S.D.N.Y. Oct.26, 2001). Defendants oppose Plaintiffs' motion to amend on the grounds that amendment would be futile because the proposed SAC would be dismissed. Accordingly, the Court must take all of the SAC's allegations as true and draw all inferences in Plaintiffs' favor. *See Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

**141.** *In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d at 397.

**142.** *See Foman*, 371 U.S. at 182, 83 S.Ct. 227; *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987).

**143.** *In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d 281, 397 (S.D.N.Y.2003) (citing *Dooner v. Keefe, Bruyette & Woods, Inc.*,

No. 00 Civ. 572 (JGK), 2003 WL 135706, at *4 (S.D.N.Y. Jan.17, 2003) ("this is the plaintiff's third complaint ... [t]hree bites at the apple is enough"); *In re Am. Express Co. Shareholder Litig.*, 39 F.3d 395 (2d Cir.1994); *Fisher v. Offerman & Co., Inc.*, No. 95 Civ. 2566 (JGK), 1996 WL 563141, at *9 (S.D.N.Y. Oct.2, 1996); *In re Hyperion Sec. Litig.*, No. 93 Civ. 7179 (MBM), 1995 WL 422480, at *8 (S.D.N.Y. July 14, 1995), *aff'd sub nom., Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir.1996)).

**144.** *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir.1995); *Elliott Associates, L.P. v. Hayes*, 141 F.Supp.2d 344, 361 (S.D.N.Y. 2000).

**145.** *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *see also Grace v. Rosenstock*, 228 F.3d 40, 46 (2d Cir.2000) ("Early in the development of such actions under § 10(b) and Rule 10b-5, which addresses fraud "in connection with" the purchase or sale of a security, this Court ruled that no private action under those provisions is available to persons who were neither buyers nor sellers of the relevant securities.").

they purchased. If the *named* plaintiffs have no cause of action in their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim." [146]   "A predicate to a plaintiff's right to represent a class is his eligibility to sue in his own right. What he may not achieve himself, he may not accomplish as a representative of a class." [147]

## C. Statute of Limitations

### 1. Period

Under section 9(e) of the Exchange Act, "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." [148]

On July 30, 2002, Congress enacted the Sarbanes–Oxley Act of 2002 (the "Act"), which provides, in pertinent part, that:

[A]   private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)), may be brought not later than the earlier of—

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation. [149]

The Act goes on to state that "Nothing in this section shall create a new, private right of action." [150]

### 2. Notice

■   A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud. . . .   Moreover, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. [151]

Facts triggering a duty to inquire are frequently termed "storm warnings." [152] "Discovery of facts for the purposes of this statute of limitations 'includes constructive or inquiry notice, as well as actual notice.' " [153]

---

**146.** *In re Initial Public Offering Sec. Litig.,* 214 F.R.D. at 122–23 (emphasis in original) (permitting substitution of lead plaintiffs) (quoting *Goldberger v. Bear, Stearns & Co.,* No. 98 Civ. 8677 (JSM), 2000 WL 1886605, at *1 (S.D.N.Y. Dec.28, 2000)) (emphasis added). *See also Ramos v. Patrician Equities Corp.,* 765 F.Supp. 1196, 1199 (S.D.N.Y.1991) ("A plaintiff, including one who is seeking to act as class representative, must have individual standing to assert the claims in the complaint against each defendant being sued by him.").

**147.** *Akerman v. Oryx Communications, Inc.,* 609 F.Supp. 363, 377 (S.D.N.Y.1984) (quoting *Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727, 734 (3rd Cir.1970)).

**148.**   15 U.S.C. § 78i(e).   This limitations period applies to claims under section 10(b).   *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 359–60, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

**149.**   Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204, § 804(b), 116 Stat. 745, 801; *see also* 28 U.S.C. § 1658.

**150.**   *Id.* at § 804(c).

**151.**   *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir.1993) (citations omitted).

**152.**   *Id.*

**153.**   *Rothman v. Gregor,* 220 F.3d 81, 96 (2d Cir.2000) (quoting *Menowitz v. Brown,* 991 F.2d 36, 41–42 (2d Cir.1993)).

To be placed on inquiry notice, plaintiffs "need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them."[154] A plaintiff in a securities fraud case "is charged with knowledge of publicly available news articles and analysts' reports" to the extent that they constitute storm warnings sufficient to trigger inquiry notice.[155] "The issue that the Court must consider is ... whether Plaintiffs 'had constructive notice of facts sufficient to create a duty to inquire further into that matter. An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice.'"[156]

Available information must establish "a probability, not a possibility" of fraud to trigger inquiry notice.[157] Moreover, in the context of dismissal, "defendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct."[158]

Once sufficient storm warnings appear, "plaintiffs must exhibit 'reasonable diligence' in investigating the possibility that they have been defrauded. If they fail to meet this obligation, plaintiffs will be held to have had 'constructive knowledge' of the fraud against them."[159]

## V. DISCUSSION

Defendants argue that Plaintiffs' proposed amendment would be futile, for a number of reasons, and that leave to amend should accordingly be denied.[160]

### A. Lante and New Focus

■ Plaintiffs identify sixteen companies whose securities were tainted by the fraudulent scheme alleged.[161] Only five of these Issuers, Efficient Networks, eMachines, Lightspan, Tanning and Tumbleweed, are named as Defendants.[162] Presumably, Plaintiffs include the remaining eleven Issuers in the SAC to establish liability on behalf of the CSFB Defendants to investors who purchased securities from any of the sixteen Issuers, but not to establish liability on the eleven Issuers who are not named as Defendants.[163] Plaintiffs have not, however, identified any plaintiffs who actually purchased shares from two of the Issuers, Lante and New Focus, during the Class Period.[164] Because none of the

154. *Salinger v. Projectavision, Inc.*, 972 F.Supp. 222, 229 (S.D.N.Y.1997).

155. *Westinghouse Elec. Corp. v. '21' Intern. Holdings, Inc.*, 821 F.Supp. 212, 222 (S.D.N.Y.1993).

156. *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir.2003) (quoting *Dodds*, 12 F.3d at 351–52).

157. *Id.*, at 194.

158. *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F.Supp. 243, 249 (S.D.N.Y. 1993).

159. *Addeo v. Braver*, 956 F.Supp. 443, 449 (S.D.N.Y.1997) (quoting *Dodds*, 12 F.3d at 350) (citations omitted).

160. *See generally* CSFBC's Opposition to Motion for Leave to Amend Complaint ("CSFBC Opp."); Issuer Opp.

161. *See* SAC, at 2.

162. *See id.* ¶ 39.

163. The eleven Issuers not named as Defendants are Airspan, Commerce One, Bsquare, CacheFlow, McData, E.piphany, Handspring, InterNAP, Lante, New Focus, and SupportSoft.

164. *See* SAC ¶¶ 8–23.

plaintiffs allege that they purchased or sold Lante and New Focus stock, the SAC is defective as to any claims arising from investments in those companies.

Plaintiffs' response to this challenge is twofold. *First,* "[w]hile the Plaintiffs understand that actual purchasers or sellers are needed of stocks ... in this instance with the similar if not identical claims, having such a high percentage of the stocks satisfies the standing issue." [165] This argument is squarely at odds with the requirement that a plaintiff be an actual seller or purchaser of stock, and must be rejected. *Second,* Plaintiffs attempt to equate the requirement of typicality, which seeks to ensure that the issues litigated in a class action are the issues appropriate to each member of the class, with the requirement of standing. "[Plaintiffs] understand this issue may also be addressed under typicality at the certification stage." [166] Such an analogy is inapt. Indeed, while the question of

standing may be deferred to the class certification stage in exceptional circumstances, such deferral is not warranted here.[167] Lante and New Focus are separate entities from each other and from the rest of the Issuer Defendants. Plaintiffs' allegation that their conduct was similar to that of the other fourteen Issuers, without a showing that any named plaintiff actually purchased or sold shares of New Focus or Lante, cannot suffice to maintain an action against the CSFB Defendants arising from investments in these two companies.[168]

Defendants further argue that any future requests for leave to amend with respect to Lante and New Focus should be denied.[169] The SAC is Plaintiffs' third attempt to plead a viable claim, and was filed after the deficiencies of the original allegations were brought to Plaintiffs' attention.[170] Repeated failure to cure a defective claim is grounds for denying leave to amend.[171] Because additional amendment

---

**165.** *See* Plaintiffs' Response In Opposition to Defendants' Motions Opposing Plaintiffs' Motion for Leave to Amend Complaint ("Reply"), at 26.

**166.** *See id.*

**167.** *See Primavera Familienstiftung v. Askin,* No. 95 Civ. 8905 (RWS), 1996 WL 494904, at *8 (S.D.N.Y. Aug.30, 1996). In *Primavera,* the plaintiff sued three hedge funds, although the plaintiff had only directly invested in one of the three funds. However, the plaintiff had, through that investment, purchased securities issued by each of the three funds. *See id.,* at *2. Moreover, the same individual was alleged to have administered all three funds. *Id.* As a result, the court deferred the standing issue to the certification stage, because "the issues of standing [we]re sufficiently bound up with those of class certification, and their resolution b[ore] sufficiently little weight on the disposition of the remainder of these motions or on the discovery process" to require their earlier resolution. *Id.,* at *8. *But see Ramos,* 765 F.Supp. at 1199 ("Numerous cases hold that the question of standing must be considered independently from the issue of whether

there is a proper class action under Rule 23"); *In re Bank of Boston Corporation Sec. Litig.,* 762 F.Supp. 1525, 1531 (D.Mass.1991) (in a securities fraud action, "[a] federal district court may not permit a plaintiff to circumvent the standing requirement simply because the plaintiff files his suit as a class action ... [t]hus, when the issue of standing is raised by a party, the Court must resolve this issue before considering the class certification requirement of Rule 23.").

**168.** At trial, Plaintiffs may show that the CSFB Defendants engaged in the alleged wrongful conduct with respect to many issuers, whether or not they are identified in the Complaint.

**169.** *See* CSFBC Opp. at 2.

**170.** *See* 9/17/03 Letter from Defendants to Court. Plaintiffs' failure to identify named plaintiffs for each Issuer Defendant was discussed at the September 22, 2003 status conference before this Court.

**171.** *See Foman,* 371 U.S. at 182, 83 S.Ct. 227.

of the complaint at this stage would create unwarranted delay in an already complex matter, Plaintiffs' claims arising from transactions involving Lante and New Focus are futile and any such claims in the proposed SAC are stricken without leave to amend.[172]

## B. Inquiry Notice

▮ Defendants argue that Plaintiffs' 10b–5 claims are time-barred.[173] Defendants point to three categories of events that they claim triggered inquiry notice: press accounts regarding alleged fraud in IPOs managed by CSFBC, the filing of related litigation, and the "Disclosing Events" that Plaintiffs allege brought an end to each of the Subclass periods.[174] Defendants claim that these events constituted sufficient "storm warnings" to place Plaintiffs on inquiry notice by January 11, 2001, and, as a result, Plaintiffs' right to sue lapsed before Plaintiffs filed the Initial Complaint on February 28, 2003, over two years later.[175]

Defendants contend, with the help of an attractively rendered full-color chart, that,

> even if the longer, "two years from discovery" rule enacted as part of the Sarbanes–Oxley Act [ ] were to apply . . ., and even if the proposed new claims were held to relate back to the filing of the original complaint . . ., and even if

the filing of the original class action complaint were deemed to toll the statute of limitations for the new plaintiffs . . ., the new claims are time-barred and leave to amend should be denied.[176]

Defendants' contention regarding the expiration of the statute of limitations is compelling only if one or more of the events they describe actually sufficed to place Plaintiffs on inquiry notice more than one (or two) years before they filed the SAC. Plaintiffs contend that they did not have access to sufficient facts to trigger inquiry notice "until the original Plaintiff, Amy Liu, retained counsel who uncovered the fraudulent scheme in February 2003." [177] Unless Defendants can produce "uncontroverted evidence [that] irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent scheme," they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law.[178] Defendants have not satisfied their burden.

### 1. The Press Accounts

Defendants point to a number of articles in readily accessible publications prior to January 2001 that refer to the same circumstances as Plaintiffs' description of the "Pop"—the immediate rise in post-IPO stock price—that was part of Defendants' scheme to defraud.[179] Defendants assert

---

172. *See In re Initial Public Offering Securities Litigation,* 241 F.Supp.2d at 398 (dismissing plaintiffs' claims without leave to amend where "Plaintiffs [ ] had numerous opportunities to amend their pleadings" and had been repeatedly advised of their deficiencies).

173. *See* Issuer Opp. at 5–6.

174. *See generally id.* at 6–13.

175. *See id.* A two year delay would bar Plaintiffs' claims under either section 9(e) or Sarbanes–Oxley. Because Defendants have not met their burden of establishing inquiry notice as a matter of law, the Court does not reach the issue of which statute applies.

176. *Id.* at 2 (emphasis in original); *see also* Issuer Defendants' chart entitled "Expiration of Discovery Periods," Appendix A to Issuer Opp.

177. SAC ¶ 46.

178. *Nivram,* 840 F.Supp. at 249.

179. *See* Issuer Opp. at 6–10; *see also* Exs. A–G to 11/6/03 Declaration of John Boyle, counsel for Issuer Defendants ("First Boyle Decl.").

that these news stories, which refer to alleged fraudulent manipulation of IPOs managed by CSFBC and other banks, made "substantially similar allegations" to those of Plaintiffs, and therefore put Plaintiffs on inquiry notice when they were released.[180] Plaintiffs are properly charged with knowledge of these articles.[181]

However, these articles, while clearly triggering inquiry notice for plaintiffs claiming damages deriving from fraudulently manipulated IPOs, say nothing about the actual scheme alleged to have damaged Plaintiffs in the instant case. It is true that many of Plaintiffs' allegations assert IPO underpricing,[182] as well as misstatements made during IPOs,[183] and analysts' conflicts of interest[184] with regard to IPOs. Defendants claim that the SAC's purported focus on IPO underpricing and analyst conflicts shows that Plaintiffs have based their claims on facts which were known to them before January 2001. But none of Plaintiffs' substantive claims rest on these alleged activities. Although Plaintiffs refer to certain misstatements contained in the prospectuses of the Issuers, they base their claims solely on misrepresentations that constitute part of the alleged fraudulent scheme.[185] The gravamen of the SAC, and indeed every one of its six claims for relief, is based on manipulation of the *secondary* markets for the Issuers' securities. Insofar as they

relate to potential claims that Plaintiffs do not actually assert, Plaintiffs' allegations regarding analysts' conflicts of interest and misrepresentations made during the IPO process are properly regarded as factual allegations establishing necessary background for the Plaintiffs' claims for relief. To hold that a complaint, which asserts only timely claims, is fatally defective simply because it contains one or more allegations of conduct that *could* be used as the basis for claims that may be stale, but is not the basis for any of the complaint's explicit claims for relief, would create an unreasonable and possibly insuperable plaintiffs' burden.

If substantially all of the factual allegations in the SAC reflected information available in January 2001, then Plaintiffs' claims would necessarily be barred. Similarly, if Plaintiffs had knowledge of sufficient facts by that time to "be capable of perceiving the general fraudulent scheme" alleged, they would have been placed on inquiry notice at that point and, again, Plaintiffs' claims would be barred.[186] But Defendants have not established either scenario. Rather, a close reading of the articles provided by Defendants in support of their claim of inquiry notice reveals few of the facts necessary to Plaintiffs' core claims regarding manipulation of the public by creating an expectation of "upside surprise" through purposeful discounting

180. Issuer Opp. at 6.

181. See *Westinghouse*, 821 F.Supp. at 222.

182. See SAC ¶¶ 1, 61, 100–28, 165–84, 208–10.

183. See *id.* ¶¶ 187–93, Ex. C.

184. See *id.* ¶¶ 65–79, 162–64.

185. See SAC ¶¶ 187–193. Specifically, Plaintiffs claim that the prospectuses included materially misleading statements about the meth-

ods Defendants used to calculate offering prices, omitting to disclose that the ultimate IPO price was discounted below what would have been an appropriate price. Whether or not such misstatements may have been actionable under the 1933 Act is an academic question. As noted earlier, Plaintiffs bring no claim under the 1933 Act. Plaintiffs make these allegations to provide support for their claim that Defendants engaged in an ongoing, consistent scheme of depressing revenue predictions to achieve quick and sustained growth in share prices.

186. *Salinger*, 972 F.Supp. at 229.

of revenue forecasts.[187]   Only one of Defendants' proffered articles mentions any facts that would reasonably suggest that companies might be fraudulently discounting their revenue forecasts.   In the April 23, 2000 Sunday Times of London, the following language appeared:

> Chuck Hill, research director at First Call, a firm that collates analysts' estimates, condemns another increasingly common and deceptive practice of deliberately understating a company's expected earnings.
>
> He says: "Nowadays it is imperative not to miss your estimates (because the market will punish the stock).   More and more firms are giving (confidential) low-ball guidance figures to analysts, knowing they can beat them.   It is naive and it is going to end badly." [188]

This passage certainly suggests that, by early 2000, some firms were fraudulently discounting their revenue estimates in an effort to manipulate investor sentiment. However, although the article does specifically refer to high-technology "bubble" stocks, it makes no mention of any of the Issuers by name, and does not suggest that CSFBC or any of the other Defendants were engaging in the practice of deliberately underestimating a company's expected earnings.   Moreover, the article does not claim that the low-ball figures were disseminated to the public.   In fact, the dearth of publicity regarding the practice of discounting revenue estimates lends credence to Plaintiffs' assertion that they did not become aware of Defendants' practices until Plaintiffs' counsel discovered them in February 2003.   Moreover, the bulk of the articles produced by Defendants center on IPO underpricing and market manipulation designed to hype stock prices through tie-in agreements and analyst collusion (the subject of the consolidated Initial Public Offering securities litigation), further supporting Plaintiffs' contention that the precise alleged fraud was not apparent before February 2003.[189]

### 2.   The Related Filings

Defendants similarly point to the filings in the In re Initial Public Offering Securities Litigation proceedings (No. 21 MC 92) as events that should have established inquiry notice.   The filing of related lawsuits can suffice to put plaintiffs on inquiry notice, where the alleged fraud is similar.[190] The first complaint in the IPO cases, *Makaron v. VA Linux Systems, Inc.*, No. 01 Civ. 0242, was filed on January 11, 2001.[191] However, as with Defendants' proffered articles, the IPO litigation did not provide notice of a scheme sufficiently similar to the alleged fraud in the instant case to put Plaintiffs on inquiry notice.

### 3.   The "Disclosing Events"

■   Finally, Defendants turn to the Disclosing Events themselves as sources of notice of potential fraud.   A Disclosing Event—either a failure of a company to meet revenue forecasts, an announcement that the company would not meet fore-

---

187.   *See* Exs. A–G to First Boyle Decl.

188.   *See* Ex. B to First Boyle Decl.

189.   *See* Exs. A–B, D–G to Issuer Opp.; Exs. A–E to 12/9/03 Declaration of John Boyle ("Second Boyle Decl.").

190.   *See Menowitz*, 991 F.2d at 42; *Ezra Charitable Trust v. Frontier Ins. Group, Inc.*, No 00–5361, 2002 WL 87723 (S.D.N.Y. Jan.23, 2002), *aff'd, LC Capital Partners v. Frontier Ins. Group. Inc.*, 318 F.3d 148 (2d Cir.2003) (holding that filing of litigation against the same defendant "put a plaintiff on inquiry notice of the probability of fraud with another transaction involving the defendant" where "the complaints in both lawsuits involve[d] similar allegations that [defendant] failed to disclose its inadequate loss reserves and did not sufficiently monitor its operations.").

191.   *See* Ex. H to First Boyle Decl.

casts, or a voluntary downgrading of a published forecast—served to alert Plaintiffs of little more than the fact that they held securities from a company that had failed to meet revenue forecasts. It provided notice, in other words, that the revenue forecasts were wrong, not that they were fraudulent. Stock price fluctuations are a factor that may be considered in determining the presence of storm warnings, but the Disclosing Events in this case were not sufficient to put plaintiffs on inquiry notice of possible fraud. Despite their suggestive title, each Disclosing Event was the unfortunate but commonplace event of a publicly traded company failing to meet its revenue forecast, coupled with a concomitant and predictable immediate drop in share prices. Such an event could not alone have led a reasonable investor to believe that the market for her stock had been artificially buoyed through a well-coordinated scheme of discounting revenue forecasts.

### 4. Reasonable Diligence

■ Defendants assert that Plaintiffs failed to discharge their duty of reasonable diligence in the face of purported "storm warnings," and therefore should be charged with constructive notice of Defendants' alleged fraud from the time when those storm warnings occurred.[192] This argument, though, depends on a finding that the news articles, court filings or Disclosing Events individually or collectively constituted storm warnings sufficient to put Plaintiffs on inquiry notice. Because Defendants have not met their burden to

establish such sufficiency as a matter of law, the Court cannot conclude, at this stage of the proceedings, that Plaintiffs shirked their duty of reasonable diligence.

Defendants point out that the SAC mentions only that counsel's pre-filing investigation was performed "shortly before the filing of the original complaint in February of 2003," and claim that such late discovery of the facts underlying the present action demonstrates a failure to diligently investigate the alleged fraud.[193] While Plaintiffs must affirmatively plead facts demonstrating that they have sued in a timely fashion, Plaintiffs' short statement of the date of discovery and the circumstances precluding earlier discovery satisfies the Plaintiffs' burden at this stage.[194]

### C. Claims of Proposed New Plaintiffs

Defendants assert that the amendment of the Complaint to include a new set of plaintiffs should be denied as time-barred on the following grounds: (1) that the proposed SAC should not relate back to the date of the Initial Complaint (February 28, 2003) because Plaintiffs have not satisfied the requirements of Federal Rule of Civil Procedure 15(c)(3), and (2) that tolling of the statute of limitations is unavailable because none of the named plaintiffs had standing at the time of the original complaint.[195]

Both of these arguments rest on Defendants' correct observation that, because "*none* of the plaintiffs who filed this action in February 2003 or joined it through the

---

**192.** *See* Issuer Opp. at 13.

**193.** *Id.,* at 13; SAC ¶ 48.

**194.** Defendants rely on *Weiss v. Ganz,* 26 F.Supp.2d 655 (S.D.N.Y.1998) in support of their contention. In *Weiss,* however, the complaint was dismissed because it alleged neither a date of discovery nor diligent investigation of claims, and in fact provided evi-

dence that the facts constituting the basis for the claim had come to light eighteen months before filing. *See id.* at 658. Here, in contrast, Plaintiffs allege (albeit imprecisely) a date of discovery and a pattern of behavior that obscured the nature of the wrongdoing until that date. *See* SAC ¶¶ 48–51.

**195.** *See* Issuer Opp. at 9–24.

First Amended Complaint—Amy Liu, Antoine Kasprzak, or Robert Tenney—had standing to pursue claims against the Issuer Defendants," none of the current named plaintiffs can now claim that they had standing to sue the Issuer Defendants at the time of the Initial Complaint. But this argument is meaningless unless Defendants can establish as a matter of law that the statute of limitations for the new named plaintiffs' claims expired before they were included in Plaintiffs' action. If Plaintiffs were not on notice of the fraudulent scheme until the filing of the Initial Complaint (February 28, 2003), as Plaintiffs allege, then the claims of the proposed new plaintiffs, asserted on October 2, 2003, would still be timely.[196] Because Defendants have not established as a matter of law that Plaintiffs were on inquiry notice before February 28, 2003, there is no need to consider the tolling and relation back issues at this time.

## VI. APPOINTMENT OF ROBERT TENNEY AS LEAD PLAINTIFF

Plaintiffs seek the appointment of Robert W. Tenney as lead plaintiff pursuant to the requirements of the PSLRA.[197] Defendants do not oppose this motion, nor has any other putative class member sought appointment as lead plaintiff. Nonetheless, Defendants raise several points "to highlight certain important issues for the Court that [Plaintiffs'] motion fails to address." [198] These issues, which concern the suitability of the lead plaintiffs and Plaintiffs' other obligations under the

PSLRA, may appropriately be addressed at the class certification stage. Accordingly, Plaintiffs' motion to appoint Robert W. Tenney as lead plaintiff is granted.

## VII. CONCLUSION

For the reasons discussed above, Plaintiffs' motion for leave to amend their complaint is granted with respect to all claims except those arising from transactions in Lante and New Focus stock. Plaintiffs' motion to add Robert W. Tenney as lead plaintiff is granted. Plaintiffs are directed to submit a revised proposed SAC, consistent with this Opinion, by June 4, 2004. The Clerk is directed to close these motions.

SO ORDERED.

196. If Plaintiffs first discovered the alleged scheme no earlier than February 28, 2003, then the claims brought by the new proposed Plaintiffs would not have expired by October 2, 2003 under the one-year statute of limitations in section 9(e). Obviously, such claims would also be timely under the two-year statute of limitations prescribed by the Sarbanes–Oxley Act. There is accordingly no need to address the issue of which term of limitations applies.

197. *See* 5/5/03 Motion of Robert W. Tenney; Plaintiffs' Memorandum of Law in Support of the Re-filed Motion of Robert W. Tenney to be Appointed Lead Plaintiff.

198. CSFB's Submission Regarding Motion for Appointment of Lead Plaintiff, at 1 (acknowledging lack of standing to object to appointment of lead plaintiff but reserving rights to raise these issues at a later date).